UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA BLOCKER, | No.  2:15-cv-1416 KJM KJN P |
| Petitioner, | |
| v. | ORDER AND FINDINGS & RECOMMENDATIONS |
| J. SOTO, Warden, | |
| Respondent. | |

I.  Introduction

     Petitioner is a state prisoner, proceeding pro se and in forma pauperis.  Petitioner filed an application for petition of writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In light of the objections to the May 10, 2016 findings and recommendations and the subsequent supplemental briefing submitted in connection thereto, the May 10, 2016 findings and recommendations are vacated, and the undersigned addresses herein respondent's motion to dismiss the habeas petition as barred by the statute of limitations.  For the reasons set forth below, respondent's motion should be granted.

II.  Legal Standards

     Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a petition if it "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court. . . ."  Id.  The Court of Appeals for the Ninth

1

1   Circuit has referred to a respondent's motion to dismiss as a request for the court to dismiss under

2   Rule 4 of the Rules Governing § 2254 Cases.  <u>See, e.g.</u>, <u>O'Bremski v. Maass</u>, 915 F.2d 418, 420

3   (1991).  Accordingly, the court reviews respondent's motion to dismiss pursuant to its authority

4   under Rule 4.

5          On April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") was

6   enacted.  Section 2244(d)(1) of Title 8 of the United States Code provides:

7          A 1-year period of limitation shall apply to an application for a writ
           of habeas corpus by a person in custody pursuant to the judgment of
8          a State court.  The limitation period shall run from the latest of –

9                  (A) the date on which the judgment became final by the
           conclusion of direct review or the expiration of the time for seeking
10         such review;

11                 (B) the date on which the impediment to filing an
           application created by State action in violation of the Constitution
12         or laws of the United States is removed, if the applicant was
           prevented from filing by such State action;
13

14                 (C) the date on which the constitutional right asserted was
           initially recognized by the Supreme Court, if the right has been
15         newly recognized by the Supreme Court and made retroactively
           applicable to cases on collateral review; or

16                 (D) the date on which the factual predicate of the claim or
           claims presented could have been discovered through the exercise
17         of due diligence.

18   28 U.S.C. § 2244(d)(1).  Section 2244(d)(2) provides that "the time during which a properly filed

19   application for State post-conviction or other collateral review with respect to the pertinent

20   judgment or claim is pending shall not be counted toward" the limitations period.  28 U.S.C.

21   § 2244(d)(2).

22         Section 2244(d)(2) provides that "the time during which a properly filed application for

23   State post-conviction or other collateral review with respect to the pertinent judgment or claim is

24   pending shall not be counted toward" the limitations period.  28 U.S.C. § 2244(d)(2).  Generally,

25   this means that the statute of limitations is tolled during the time after a state habeas petition has

26   been filed, but before a decision has been rendered.  <u>Nedds v. Calderon</u>, 678 F.3d 777, 780 (9th

27   Cir. 2012).  However, "a California habeas petitioner who unreasonably delays in filing a state

28   habeas petition is not entitled to the benefit of statutory tolling during the gap or interval

                                                        2

preceding the filing." Id. at 781 (citing Carey v. Saffold, 536 U.S. 214, 225-27 (2002)).

Furthermore, the AEDPA "statute of limitations is not tolled from the time a final decision is

issued on direct state appeal and the time the first state collateral challenge is filed because there

is no case 'pending' during that interval." Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir. 1999),

overruled on other grounds by Carey, 536 U.S. at 214.  In Carey, the United States Supreme

Court held that the limitation period is statutorily tolled during one complete round of state post-

conviction review, as long as such review is sought within the state's time frame for seeking such

review.  Id., 536 U.S. at 220, 222-23.  State habeas petitions filed after the one-year statute of

limitations has expired do not revive the statute of limitations and have no tolling effect.

Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003) ("section 2244(d) does not permit the

reinitiation of the limitations period that has ended before the state petition was filed"); Jiminez v.

Rice, 276 F.3d 478, 482 (9th Cir. 2001).

III.  Chronology

      For purposes of the statute of limitations analysis, the relevant chronology of this case is

as follows:

      1.  Petitioner pled no contest to eight counts of second degree robbery and admitted strike,

serious felony, and personal use of a deadly weapon allegations.  (ECF Nos. 1 at 2; (Respondent's

Lodged Document ("LD") 1.))

      2.  On November 2, 2011, petitioner was sentenced to a determinate state prison term of

30 years.  (LD 1.)

      3.  Petitioner appealed the restitution order referenced in the abstract of judgment.

      4.  On June 26, 2012, the California Court of Appeal for the Third Appellate District

issued the following order:

> The trial court is directed to delete the references to the restitution
> order in the minute order and abstract, hold a restitution hearing,
> prepare an amended minute order and abstract reflecting the results
> of that hearing, and forward a copy of the corrected abstract to the
> Department of Corrections and Rehabilitation.  In all other respects
> the judgment is affirmed.

(LD 2.)

5. Petitioner did not appeal the June 26, 2012 order.

6. On December 7, 2012, the Sacramento County Superior Court held a restitution hearing, at which petitioner was represented by counsel.  (LD 3.)  Petitioner did not appeal.

7. On August 24, 2014,[1] petitioner filed a petition for writ of habeas corpus in the Sacramento County Superior Court. (LD 4.)  On October 27, 2014, the superior court denied the petition.  (LD 5.)

8. On December 7, 2014,[2] petitioner filed a petition for writ of habeas corpus in the California Court of Appeal for the Third Appellate District.  (LD 6.)  The appellate court denied the petition on December 18, 2014.

9. On January 28, 2015, petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (LD 8.)  On April 29, 2015, the California Supreme Court denied the petition without comment.  (LD 9.)

10. On June 28, 2015, petitioner filed the instant federal petition.  (ECF No. 1.)  See Rule 3(d) of the Federal Rules Governing Section 2254 Cases.

11. Respondent filed the motion to dismiss on October 7, 2015.  (ECF No. 13.)  Petitioner was granted multiple extensions of time.  (ECF Nos. 15, 17, 19.)  On March 30, 2016, petitioner was granted one final extension of time; his opposition was due on or before April 29, 2016. (ECF No. 21.)  Petitioner did not file an opposition.

IV.  Statutory Tolling

Under 28 § 2244(d)(1)(A), the limitations period begins running on the date that petitioner's direct review became final or the date of the expiration of the time for seeking such review.  Id.  Where the state appellate court remands for re-sentencing, the limitations period does not begin until both the conviction and re-sentencing claims are final on direct review.  Burton v. Stewart, 549 U.S. 147, 156-57 (2007) (per curiam).

---

[1]  Unless otherwise indicated, all of petitioner's subsequent court filings were given benefit of the mailbox rule.  See Campbell v. Henry, 614 F.3d 1056, 1059 (9th Cir. 2010) (under the mailbox rule, the petition is deemed filed when handed to prison authorities for mailing).

[2]  This petition was signed on December 3, 2014, but the proof of service is dated December 7, 2014.

1        In this case, petitioner did not appeal the superior court's December 7, 2012 restitution

2 order.  Accordingly, his conviction became final sixty days later on February 5, 2013.  Cal. Rules

3 of Court 8.308(a); Mendoza v. Carey, 449 F.3d 1065, 1067 (9th Cir. 2006).  The AEDPA statute

4 of limitations began to run the following day, on February 6, 2013.  Patterson v. Stewart, 251

5 F.3d 1243, 1246 (9th Cir. 2001).  Absent tolling, petitioner's last day to file his federal petition

6 was on February 6, 2014.

7        Petitioner filed his first state court petition on August 24, 2014, over six months after the

8 limitations period expired.  Thus, this action and his subsequent state petitions were not "properly

9 filed" so as to toll the running of the limitations period.  Moreover, a state court habeas petition

10 filed beyond the expiration of AEDPA's statute of limitations does not toll the limitations period

11 under § 2244(d)(2).  See Ferguson, 321 F.3d at 823; Jiminez, 276 F.3d at 482 (state habeas

12 petition filed after the statute of limitations ended "resulted in an absolute time bar").

13 Accordingly, petitioner is not entitled to statutory tolling.

14 V.  Equitable Tolling

15        The limitations period expired on February 6, 2014, and petitioner did not file the instant

16 petition until June 28, 2015.  Absent equitable tolling, the instant petition is time-barred.

17        The one year statute of limitations for filing a habeas petition may be equitably tolled if

18 extraordinary circumstances beyond a prisoner's control prevent the prisoner from filing on time.

19 Holland v. Florida, 560 U.S. 631, 645 (2010).  A litigant seeking equitable tolling must establish:

20 "(1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance

21 stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).  The Ninth Circuit has

22 explained:

23                To apply the doctrine in "extraordinary circumstances" necessarily
suggests the doctrine's rarity, and the requirement that
24                extraordinary circumstances "stood in his way" suggests that an
external force must cause the untimeliness, rather than, as we have
25                said, merely "oversight, miscalculation or negligence on [the
petitioner's] part, all of which would preclude the application of
26                equitable tolling.

27 Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1011 (9th Cir.) (internal citation omitted), cert.

28 denied, 130 S. Ct. 244 (2009); see also Stillman v. LaMarque, 319 F.3d 1199, 1203 (9th Cir.

1   2003) (petitioner must show that the external force caused the untimeliness).  It is petitioner's

2   burden to demonstrate that he is entitled to equitable tolling.  Espinoza-Matthews v. People of the

3   State of California, 432 F.3d 1021, 1026 (9th Cir. 2005).  "The diligence required for equitable

4   tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.'"  Holland, 560 U.S.

5   at 653 (internal citations and additional quotation marks omitted).

6           Here, petitioner alleged no facts in his petition explaining his delay in bringing the instant

7   action.  Despite being granted numerous extensions of time, petitioner did not file an opposition

8   to the motion to dismiss.  However, petitioner filed objections[3] to the May 10, 2016 findings and

9   recommendations claiming, for the first time, that he suffers from a serious mental illness that

10  warrants equitable tolling, and that the failure of prison officials to provide mentally ill inmates

11  with adequate legal assistance is tantamount to extraordinary circumstances that also warrants

12  equitable tolling.  In response to the court's further briefing order, respondent filed a response to

13  the objections, accompanied by petitioner's prison mental health and medical records from the

14  beginning of his incarceration in 2011 through 2016, as well as other pertinent documents.  (ECF

15  No. 31-1 to 31-18.)  On October 14, 2016, petitioner filed a reply to petitioner's response, which

16  states that another prisoner "assisted/drafted/prepared" the reply.  (ECF No. 35 at 3.)  On January

17  3, 2017, petitioner filed a supplemental traverse with the assistance of an unidentified inmate

18  legal assistant.

19          A.  Mental Illness

20              1.  Equitable Tolling Test

21          The Ninth Circuit has articulated a specific, two-part test for an equitable tolling claim

22  based on a petitioner's mental impairment:

23              (1) *First,* a petitioner must show his mental impairment was an
                "extraordinary circumstance" beyond his control by demonstrating
24              the impairment was so severe that either

25  _____

26  [3]  In his objections, petitioner primarily argued procedural default.  (ECF No. 23.)  However, as
    argued by respondent, state procedural default does not apply here.  White v. Martel, 601 F.3d
27  882, 884 (9th Cir. 2010) (the adequacy analysis used to decide state procedural default issues is
    inapplicable to the determination of whether a federal habeas petition is barred by the federal
28  statute of limitations).

6

> (a) petitioner was unable to rationally or factually to personally understand the need to timely file, or
>
> (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing.
>
> (2) *Second,* the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance.

Bills v. Clark, 628 F.3d 1092, 1099-1100 (9th Cir. 2010) (citations omitted) (italics in original);

see also Orthel v. Yates, 795 F.3d 935, 938 (9th Cir. 2015) ("A petitioner seeking equitable

tolling on the grounds of mental incompetence must show extraordinary circumstances, such as

an inability to rationally or factually personally understand the need to timely file, or a mental

state rendering an inability personally to prepare a habeas petition and effectuate its filing.").

"The relevant question [is,] '[d]id the mental impairment cause an untimely filing?'"

Stancle v. Clay, 692 F.3d 948, 959 (9th Cir. 2012) (quoting Bills, 628 F.3d at 1100 n.3.)  Bills

provides further guidance for applying its two-part test:

> [T]o evaluate whether a petitioner is entitled to equitable tolling, the district court must:  (1) find the petitioner has made a non-frivolous showing that he had a severe mental impairment during the filing period that would entitle him to an evidentiary hearing; (2) determine, after considering the record, whether the petitioner satisfied his burden that he was in fact mentally impaired; (3) determine whether the petitioner's mental impairment made it impossible to timely file on his own; and (4) consider whether the circumstances demonstrate the petitioner was otherwise diligent in attempting to comply with the filing requirements.

Bills, 628 F.3d at 1100-01.  "This reiterates the stringency of the overall equitable tolling test:  the

mental impairment must be so debilitating that it is the but-for cause of the delay, and even in

cases of debilitating impairment the petitioner must still demonstrate diligence."  Yeh v. Martel,

751 F.3d 1075, 1078 (9th Cir.), cert. denied sub nom. Yeh v. Biter, 135 S. Ct. 486 (2014), citing

Bills, 628 F.3d at 1100.

A petitioner alleging a severe mental impairment during the filing period is not entitled to

an evidentiary hearing unless he or she makes "a good faith allegation that would, if true, entitle

him to equitable tolling."  Laws v. Lamarque, 351 F.3d 919, 921 (9th Cir. 2003) (remanding for

7

1  consideration of whether the petitioner's delayed filing was "attributable to psychiatric

2  medication which deprived petitioner of any kind of consciousness" where the petitioner had

3  demonstrated "evidence of serious mental illness" by attaching prison psychiatric and medical

4  records).  The district court must take care to ensure that the record regarding the petitioner's

5  mental illness is sufficiently developed to rule on the tolling issue.  See Chick v. Chavez, 518

6  Fed. Appx. 567, 568 (9th Cir. 2013) (remanding "for further development of the record as to

7  [petitioner]'s mental competency and, if necessary, an evidentiary hearing"); see Bills, 628 F.3d

8  at 1099-1100 (remanding where the petitioner was in the lowest percentile for verbal IQ, verbal

9  comprehension and working memory, and, according to clinical psychologists, was incapable of

10  inferential thinking necessary to complete a federal habeas form).  Nevertheless, "[w]here the

11  record is amply developed, and where it indicates that the petitioner's mental incompetence was

12  not so severe as to cause the untimely filing of his habeas petition, a district court is not obligated

13  to hold evidentiary hearings to further develop the factual record, notwithstanding a petitioner's

14  allegations of mental incompetence."  Roberts v. Marshall, 627 F.3d 768, 773 (9th Cir. 2010); See

15  also Orthel, 795 F.3d at 939-40.

16                 2.  The Parties' Positions

17                     a.  Respondent

18         Respondent argues that petitioner fails to detail the exact nature of his mental illness, the

19  time period he suffered from such impairments, and how they prevented him from timely

20  challenging his conviction.  (ECF No. 31 at 4.)  Rather, petitioner's declaration appended to his

21  objections contains only generalized statements.  Also, petitioner fails to demonstrate his alleged

22  incompetence throughout the relevant limitations period.  Instead, the record reflects that

23  petitioner received mental health treatment for many years, and there is a paucity of evidence that

24  he suffered from a severe impairment during the year that the limitations period ran.  (ECF No. 31

25  at 5.)  Specifically, petitioner was included in the CCCMS[4] level of care from the beginning of his

26  _____

27  [4]  "CCCMS" is an acronym for the Correctional Clinical Case Management System and inmates
designated to this level of care are those "whose symptoms are under control or in partial
remission and can function in the general prison population, administrative segregation, or

28  segregated housing units."  Coleman v. Schwarzenegger, 2009 WL 2430820, *15 n.24 (E.D. Cal.

incarceration in 2011 through July 2015, and was treated as an outpatient and usually housed in the general population.  (ECF No. 31 at 6.)  Petitioner was placed in EOP in August of 2015.  (ECF No. 31 at 6.)  But even then, petitioner's mental health was noted as "stable" and "no mental health issues noted/reported."  (ECF No. 31 at 6.)  In addition, from 2013 to 2014, petitioner's GAF scores typically ranged in the mid-60s.  Respondent points out that while petitioner's GAF score was in the mid 20s to 30s both before and after the limitations period, he also received GAF scores of 65-70.  (ECF No. 31 at 7.)

Respondent argues that this case is similar to <u>Orthel</u> because petitioner's mental health did not significantly change in the years immediately before and after the limitations period ran, and the record reflects that petitioner's mental state did not worsen to the extent he required EOP level of care until shortly after he filed the instant petition.  Despite the numerous notations reflecting that petitioner was diagnosed with depression, antisocial personality disorder, schizoaffective disorder and bipolar disorder throughout his incarceration, the records do not reflect evidence of urgent or emergent mental health issues indicating a lack of understanding or inability to timely file a federal petition.  (ECF No. 31 at 8.)  The records documenting petitioner's cognitive function largely indicate he was stable, alert, cooperative, his thoughts were oriented, and his behavior was within normal limits.  Although petitioner was prescribed medications, the records noted petitioner was stable on the medications.  (ECF No. 31 at 9.)

Moreover, respondent points out that there are records that show petitioner may have been exaggerating symptoms, and contain warnings for prison personnel to "consider the presence of secondary gain given his current Ad-Seg term and multiple pending 115s."  (ECF No. 31 at 7.)  The record contains notations that petitioner was non-compliant on the medications and with the

---

2009); <u>Washington v. McDonald</u>, 2010 WL 1999469 (C.D. Cal. Feb. 19, 2010).  The EOP level of care is for inmates who suffer "Acute Onset or Significant Decompensation of a serious mental disorder characterized by increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment," and who are unable to function in the general prison population but do not require twenty-four hour nursing care or inpatient hospitalization.  <u>Coleman</u>, 2009 WL 2430820, *15 n.24 (citation omitted).  The Mental Health Crisis Bed ("MHCB") Placement is "for inmates who are markedly impaired and/or dangerous to others as a result of mental illness, or who are suicidal, and who require 24-hour nursing care."  <u>Id.</u> (citation omitted).

1    mental health treatment regimen, i.e., not attending groups or 1:1 sessions, which caused his

2    mental state to decline.  (ECF No. 31 at 9.)  Respondent argues that when a prisoner contributes

3    to his condition by refusing treatment, his circumstances are no longer beyond his control, thus

4    precluding equitable relief.  (Id.)

5             In addition, respondent contends that the records reflect that petitioner understood the

6    need to file a petition, and had the ability to avail himself of legal assistance.  (ECF No. 31 at 9.)

7    For example, petitioner filed three state habeas petitions, either on his own or with assistance, in a

8    timely and orderly fashion, as well as the instant petition and numerous motions and pleadings in

9    this case.  (ECF No. 31 at 10.)  In addition, petitioner filed four articulate inmate grievances:

10   three challenging rules violation reports (in 2013, 2014 & 2015), and one regarding property

11   (2015).  In support, respondent relies on Yeh, 751 F.3d at 1078 (no equitable tolling for mental

12   impairment where the prisoner repeatedly sought administrative and judicial remedies, including

13   three state habeas petitions); and Roberts, 627 F.3d at 773 (prisoner managed to file several state

14   post-conviction collateral actions within the relevant time frame; thus, his mental incompetence

15   was not so "severe" as to cause untimely filing).  Also, petitioner's filings undercut his claim that

16   he is entitled to equitable tolling because prison officials allegedly denied him meaningful access

17   to the law library as a mentally ill inmate in violation of the Americans with Disabilities Act

18   ("ADA").  (ECF No. 31 at 10.)  Respondent provides evidence that petitioner has not been

19   designated as disabled for purposes of the ADA, and he has not been denied mental health

20   treatment.  Respondent contends that prisoners have no right to legal assistance when pursuing

21   habeas relief, and that petitioner concedes he has "zero understanding of the law," which also

22   does not warrant equitable tolling.  (ECF No. 31 at 10-11.)

23            Finally, respondent argues that petitioner fails to show diligence from 2011 through July

24   2015 when the records reflect he was stable and functioning, and filing grievances and habeas

25   petitions.

26                              b.  Petitioner

27            Petitioner contends that his mental impairments of schizo-affective disorder, bipolar Type

28   I, manic-depression, for which he is taking anti-psychotic medications, renders him incompetent

                                          10

1    and were the extraordinary circumstance beyond his control which prevented him from timely

2    filing his federal petition.  (ECF No. 35 at 1.)  Prison officials denied petitioner beneficial access

3    to the law library as a qualified individual suffering from a serious disability of serious mental

4    illness, in violation of the ADA.  (ECF No. 35 at 4.)  He argues that the Supreme Court has found

5    that mentally ill prisoners should be provided with assistance, meaning help with reading legal

6    papers to discover meritorious legal claims and preparing legal documents, citing <u>Armstrong v.

7    Wilson</u>, 124 F.3d 1019, 1023 (9th Cir. 1997).  The CDCR prison law library staff and inmate

8    clerks are prohibited from doing anything more than providing inmates with legal textbooks, legal

9    research guides, and legal forms, thus denying mentally ill inmates adequate legal assistance.

10   (ECF No. 35 at 6.)  The denial of such assistance constitutes extraordinary circumstances outside

11   his control because the CDCR does not provide paralegals or attorneys to assist mentally ill

12   inmates, violating <u>Lewis v. Casey</u>, 518 U.S. 343, 354 (1996).  (ECF No. 36 at 7.)

13          In his supplemental traverse brief, petitioner contends he was housed at an approved

14   CCCMS facility that also housed EOP inmates, and claims that the law library did not provide

15   adequate inmate clerks that knew what they were doing.  (ECF No. 36-1 at 2.)  Thus, petitioner

16   had to find an "inmate legal assistant willing to help, as general population looks down on

17   inmates that are participating in the mental health system."  (<u>Id.</u>)

18          Petitioner recounts his drug regimen:

19          In 2012, Risperdal, Remeron, and Mirtazapine, which alter the mind to reduce "schizo-

20   affects" and voices in his mind;

21          In late 2012 and early 2013, Vistaril, hydroxyzine, and Abilify; and

22          In 2014, Remeron and Strattera, prescribed by a psychiatrist, due to increase of "schizo-

23   affective" episodes.

24          Petitioner appears to argue that there were disputes among the psychologist, psychiatrist

25   and licensed clinician, but claims it was clear that the psychiatrist believed petitioner continued to

26   hear voices and suffer "schizo-effects," and that petitioner did not receive EOP treatment until

27   2015, when the <u>Coleman</u> attorney and petitioner's psychiatrist exerted pressure to do so.  (ECF

28   No. 36-1 at 3.)  Further, petitioner argues that when an individual hears voices or suffers a schizo

episode, he cannot distinguish between what's real and what's fantasy or only in the mind, preventing him from being able to challenge his conviction or to understand what to do or how to do it.

Petitioner claims that, due to his recurrent psychosis, he has historically taken Risperdal, which causes abnormal thinking and confusion. Since 2010, before and after his incarceration, petitioner was taking Remeron, which causes insomnia, dyspepsia, abnormal dreams, abnormal thinking, mood or mental changes, agitation and confusion. (ECF No. 36-1 at 3.) Petitioner provides the listed side effects from drugs.com for such drugs. (ECF No. 36-1 at 7-14.) Petitioner was also prescribed Vistaril and Abilify which cause, respectively, somnolence, attention disturbance, fatigue, depression, confusion, disorientation, and hallucinations; and drowsiness/dizziness, sedation, loss of balance control, anxiety, inability to sit still, hallucination, delusion, and affect lability. (ECF No. 36-1 at 4.) Petitioner also provides the listed side effects for these drugs from drugs.com. (ECF No. 36-1 at 16-28.)

Petitioner argues that most of these medications combined to increase the side effects on his ability to function in his daily activities without assistance, resulting in problems with his ability to understand how to meet or seek tolling of the deadline. (ECF No. 36-1 at 4.) Petitioner contends he was only able to file grievances with the assistance of CDCR staff, who are unavailable to assist in filing legal motions or actions. (ECF No. 36-1 at 4-5.)

### 3. CDCR Mental Health Services Delivery System

Respondent provided the program guide overview, revised in 2009, identifying the various levels of mental health care, in pertinent part:

#### a. Correctional Clinical Case Management System ("CCCMS")

--Stable functioning in the general population, Administrative Segregation Unit (ASU or ad seg), or Security Housing Unit (SHU); and

--Criteria not met for higher levels of care; and

--Exhibits symptom control, or is in partial remission as a result of treatment.

////

////

12

--These conditions usually result in Global Assessment of Functioning ("GAF")[5] scores of 50 and above.

b. <u>Enhanced Outpatient Program ("EOP")</u>

. . .

c. <u>Mental Health Crisis Bed ("MHCB")</u> Placement

--Marked impairment and dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour nursing care; and/or:

--Dangerousness to others as a consequence of a serious mental disorder, and/or dangerousness to self for any reason.

--These conditions usually result in a GAF score of less than 30.

(ECF No. 31-16 at 2-3)

4. <u>Mental Health Records</u>[6]

On November 28, 2011, petitioner was excluded from the Developmental Disability

---

[5] "Global Assessment of Functioning," or "GAF," is a scale used by clinicians to assess an individual's overall level of functioning, including the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions 32 (4th ed. 2004) ("DSM IV-TR"). A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school function (e.g, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. <u>Id.</u> A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers.) <u>Id.</u> A 41-50 rating indicates serious symptoms such as suicidal ideation, severe obsessional rituals, or serious impairment in social, work, or school functioning. A GAF of 31-40 indicates: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.)" <u>Id.</u> A GAF of 21-30 indicates: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." <u>Id.</u>

[6] In citing to exhibits, the undersigned uses CM/ECF numbers rather than the Bate stamped numbers provided on the exhibits. Not all exhibits are referenced below because medical records not relevant to the analysis, and mental health records for time frames before the limitations period ran, as well as long after the limitations expired, were provided.

13

1   Program ("DDP") after receiving a passing score on the cognitive test "Quick."  (ECF No. 31-2 at

2   101.)

3         On December 14, 2011, B. Safaei-Far, Psy.D. performed a mental health evaluation while

4   petitioner was housed in general population, and not taking psychotropic medications ("reports he

5   does not need it at this time.").  (ECF No. 31-2 at 182, 184.)  His TABE[7] was 6.6; petitioner

6   reported he completed 7th grade, but had to stop school to take care of his siblings.  (ECF No. 31-

7   2 at 183.)  All of the boxes on the mental status exam form were marked "within normal limits"

8   and "none," except that his affect was sad, his mood depressed, and he reported "hearing people

9   talking to him; hears the voices of his dead family."  (ECF No. 31-2 at 185.)  Petitioner had a

10  history of attempting suicide, and was at future risk of such attempt based on his poor coping

11  skills and impulsivity.  (ECF No. 31-2 at 186.)  Diagnosis:  MDD (major depressive disorder)

12  recurrent severe with psychotic features (Axis I); GAF 55; moderate functional impairment due to

13  mental illness symptoms.  (ECF No. 31-2 at 187.)  Petitioner admitted to CCCMS level of care,

14  but managed symptoms without medication.  (ECF Nos. 31-2 at 187; 31-2 at 98.)  Suicide risk

15  evaluation also performed.  (ECF No. 31-3 at 8-9.)

16        On January 19, 2012, petitioner was receiving CCCMS level of care and had a GAF of 55.

17  (ECF No. 31-2 at 98, 99.)  His TABE was 6.6.  On January 20, 2012, petitioner, housed at NKSP,

18  was prescribed Risperdal 2 mg (antipsychotic), and Remeron 15 mg (antidepressant).  (ECF Nos.

19  31-1 at 24; 31-2 at 97.)  Diagnosis:  Psychotic disorder, not otherwise specified ("NOS");

20  depressive disorder, NOS (Axis I).  (ECF No. 31-11 at 40.)

21        On February 6, 2012, petitioner reported hearing his family from both inside and outside

22  his head, present all the time; voices consist of women, men and children, but not animals/music

23  or machinery.  He sees "flashes. . . colors. . . stars" and "shadows . . . off to the side."  He feels

24  paranoid.  Tries to read but "can't concentrate."  (ECF No. 31-11 at 30.)  Petitioner was taking

25  Risperdal 2mg and Remeron 15 mg; side effects noted as arm jerking (bilateral).  (Id.)

26  _____

27  [7]  TABE stands for "Test of Adult Basic Education," which measures an inmate's ability to
    understand and participate in the disciplinary process.  See Cal. Code Regs., tit. 15, § 3000
    (defining "effective communication").  When an inmate has a TABE score of 4.0 or below, prison

28  staff must assess whether the inmate requires a Staff Assistant.  Id.

14

1  Stopped Risperdal due to EPS (drug-induced movement disorders) and lack of clear indication;

2  psychotic symptoms are of atypical quality); increased Remeron to 30 mg for depression.  (ECF

3  No. 31-11 at 30.)  Mirtazapine 15 mg stopped.  (ECF No. 31-2 at 16.)

4          On March 13, 2012, petitioner's GAF score was 60.  (ECF Nos. 31-2 at 95; 31-11 at 38.)

5  He was evaluated for suicide risk; mental status exam reflected appearance, sleep, mood, and

6  speech were within normal limits; appetite fair; affect restricted; general coping fair; compliance

7  with medication, had hope, and was oriented x 3.  (ECF No. 31-3 at 6-7.)  CCCMS continued.

8          On April 9, 2012, petitioner reported feeling "down and out," got into a fight with another

9  inmate when another inmate got upset over a piece of bread; continues to work as a porter;

10  complained of "voices in his head," unintelligible whispers, and of his mother saying encouraging

11  things; saw "shadows" in his peripheral vision.  (ECF No. 31-11 at 37.)  Reported "lazy" feeling

12  on Remeron 30 mg; prescription reduced to 15 mg.  (ECF Nos. 31-11 at 37; 31-2 at 15.)

13  Mirtazapine 30 mg stopped.  (ECF No. 31-2 at 15.)  Diagnosis of psychiatrist R. Shahbazian,

14  M.D.:  depressive disorder NOS; no evidence of genuine psychosis (Axis I); GAF 56.  (ECF No.

15  31-11 at 37.)

16          On May 30, 2012, petitioner reported feeling depressed and sleepy; GAF was 55; MDD,

17  recurrent, moderate.  (ECF No. 31-11 at 36.)  On June 11, 2012, Vistaril 50 mg prescribed.  (ECF

18  No. 31-2 at 13.)  On June 19, 2012, clinical summary noted petitioner takes Vistaril, stable, mood

19  and sleep stable, no significant distress or crisis, retain in CCCMS.  (ECF No. 31-2 at 177.)

20  Petitioner had history of depression and auditory hallucinations, Vistaril prescribed for nocturnal

21  agitation, TABE 6.6, Diagnoses:  MDD (severe psychosis) (Axis I); and antisocial trends (Axis

22  II); GAF 55.  (ECF No. 31-2 at 177, 179.)  All of the boxes on the mental status exam form were

23  marked "within normal limits" and "none."  (ECF No. 31-2 at 180.)  All of the boxes on the level

24  of care considerations form marked "no," indicating petitioner was able to adequately function at

25  CCCMS level of care or that he did not demonstrate chronic psychiatric symptoms that have not

26  responded to at least six months of treatment. (ECF No. 31-2 at 180.)

27          On August 23, 2012, during brief mental health evaluation, petitioner said he was "doing

28  good," that "Vistaril helps," and denied side effects from medication.  (ECF No. 31-3 at 5.)  Axis

15

1   I diagnosis:  adjustment disorder.  (Id.)  On August 24, 2012, hydroxyzine pamoate 50 mg

2   renewed.  (ECF No. 31-2 at 12.)  On August 29, 2012, O. Valdes, M.D., Psychiatrist, saw

3   petitioner cell side due to time constraints for brief mental health evaluation; petitioner reported

4   he was "all right;" GAF 57.  (ECF No. 31-3 at 4.)

5       On September 5, 2012, petitioner reported he was "stressing but managing.  I stay to

6   myself a lot to avoid trouble.  Sometimes I hear voices, but they don't bother me."  (ECF No. 31-

7   11 at 31.)  Petitioner was medication compliant, on Vistaril.  (Id.)  On October 23, 2012,

8   petitioner reported he was fine; feels anxious at night time.  (ECF No. 31-11 at 27.)  Hydroxyzine

9   pamoate 50 mg stopped; prescribed Vistaril 100 mg.  (ECF No. 31-2 at 10; see also 31-11 at 27.)

10      On December 8, 2012, petitioner received an urgent mental health referral chrono noting

11  he missed over 3 doses of his medication hydroxyzine and needed psychotropic medication

12  review.  (ECF No. 31-2 at 94.)  On December 11, 2012, hydroxyzine pamoate 50 mg renewed.

13  (ECF No. 31-2 at 8, 9.)  A mental health screening was completed by T. Pacheco, title unknown,

14  who concluded that there was an "indication that [petitioner] is suffering from a mental illness,"

15  and noted his adaptive functional assessment as "good."  (ECF No. 31-2 at 23-26.)  Psychiatrist

16  O. Hicks, M.D., noted that petitioner feels restless in the night and obsessively ruminates about

17  his life.  (ECF No. 31-11 at 24.)  The mental status exam was normal, other than mood noted as

18  "a little anxious," and insight/judgment were fair.  (Id.)  Hydroxyzine pamoate 100 mg was

19  continued for anxiety.  (ECF No. 31-11 at 25.)  Petitioner, in CCCMS, was placed in ad seg on

20  December 13, 2012; behavior noted as calm; stable on treatment.  (ECF No. 31-11 at 22.)

21      On December 18, 2012, A. Maez, Ph.D., clinical psychologist, had confidential interview

22  with petitioner who complained of depression and anxiety; worried about his girlfriend who was

23  caught trying to introduce drugs into prison; racing thoughts; reports he hears voices, but no

24  history of auditory hallucinations; wants to move into EOP to have outdoor time.  (ECF No. 31-

25  11 at 19.)  Dr. Maez found history of depression likely exaggerated given current drug smuggling

26  situation causing reactive depressive transitory state.  (ECF No. 31-11 at 19.)

27      On December 19, 2012, petitioner was housed in ad seg at the CCCMS level of care;

28  clinical summary noted he began mental health treatment during his first term at which time he

reported depressive symptoms and auditory hallucinations, e.g., voices.  (ECF No. 31-2 at 172.)
No overt evidence of psychosis noted; petitioner taking Vistaril, and reported "he is stable
overall," sleep and appetite adequate, no suicidal or homicidal ideation.  (ECF No. 31-2 at 172.)
Petitioner was well groomed, orientation within normal limits, articulate; all boxes regarding
cognition/sensorium and thought processes marked within normal limits, insight and judgment
were fair.  (ECF No. 31-2 at 173.)  Diagnosis:  depressive disorder, NOS (Axis I); GAF 62; mild
functional impairment.  (ECF No. 31-2 at 174.)  All of the boxes on the level of care
considerations form marked "no."  (ECF No. 31-2 at 175.)  IDTT (interdisciplinary treatment
team) confirmed CCCMS placement.  (ECF No. 31-11 at 17.)  Hydroxyzine pamoate made
petitioner's tongue feel "numb," so Dr. Hicks changed the prescription to hydroxyzine hcl tablets.
(ECF No. 31-11 at 18.)

On December 27, 2012, Dr. Maez reported petitioner was asleep, euthymic, and did not
feel like a session; Dr. Maez assessed petitioner as depressed, lethargic, isolative, and low
motivation.  (ECF No. 31-11 at 14.)  On December 31, 2012, Dr. Maez noted that petitioner's
recent cellmate triggered petitioner's hypervigilance and paranoia.  (ECF No. 31-11 at 11.)  Dr.
Maez noted petitioner believes cellmate is planning and plotting to do him harm; petitioner is not
sleeping well, agitated; average intelligence; and assessed petitioner as paranoid, hypervigilant,
and agitated.  (ECF No. 31-11 at 11.)

On January 8, 2013, petitioner was admitted to MHCB with diagnosis of MDD; principal
diagnosis was adjustment disorder with disturbance of conduct.  (ECF No. 31-11 at 43-45; see
also No. 31-11 at 57-60.)  Petitioner reported suicidal ideation after girlfriend broke up with him
after she was caught smuggling drugs into prison.  (ECF No. 31-12 at 33.)  On January 9, 2013,
GAF 25.  (ECF No. 31-11 at 61.)  On January 10, 2013, petitioner's diagnosis was MDD,
recurrent, severe with psychotic features (by history); polysubstance dependence (in controlled
environment) (Axis I): GAF 45.  (ECF No. 31-11 at 64.)  All of the boxes on the level of care
considerations form marked "no."  (ECF No. 31-11 at 65.)  On January 10, 2013, petitioner
refused to exit cell for IDTT, who assembled outside cell door and invited him to participate;
petitioner refused to speak.  (ECF No. 31-11 at 68-69.)  On January 11, 2013, petitioner told

17

1   psychiatrist P.W. Davidson, M.D., that Remeron helped a little.  (ECF No. 31-11 at 70.)  Dr.

2   Davidson charted that petitioner's "voices" are not deemed to be hallucinations, and no psych

3   meds at present; prescribed Remeron 30 mg, and diagnosed depression.  (ECF No. 31-11 at 70-

4   71.)  On January 14, 2013, petitioner presented well groomed, with broad congruent affect,

5   irritable angry mood, logical and coherent thought process and hostile behavior.  (ECF No. 31-12

6   at 3.)  On January 15, 2013, C. Jordan, Psy.D. recorded that petitioner was calm upon approach to

7   cell, but became irritable/agitated with expansive affect during contact; marginally cooperative;

8   grooming and hygiene fair; alert; oriented x 4; speech clear and goal directed; thought process

9   clear, coherent and goal directed; thought control perseverative on stated complaints over

10   perceived unprofessional behavior of staff asserting that he may have safety concerns; no overt

11   evidence of perceptual disturbance or thought disorder; history of endorsing command auditory

12   hallucinations; reports paranoid/ persecutory beliefs that appear to be reality-based considering

13   nature of recent events that precipitated MCHB placement; judgment and insight marginal.  (ECF

14   No. 31-11 at 4.)  Assessed with MDD (by history); diminished acute risk in current treatment

15   setting; history of acting out behavior and history of poor coping skills.  (ECF No. 31-12 at 4.)

16        On January 17, 2013, Oleg Liflyandsky, M.D., discharged petitioner from crisis bed;

17   diagnoses:  adjustment disorder with disturbance of conduct; history of polysubstance dependence

18   (Axis I); antisocial personality traits versus disorder (Axis II); recent breakup with a girlfriend

19   (Axis IV); GAF 70.  (ECF No. 31-11 at 47.)  Dr. Liflyandsky opined that there was no strong

20   evidence that petitioner actually exhibits major depressive disorder.  (ECF No. 31-11 at 48.)

21        On January 17, 2013, petitioner's mental health chrono noted he had a qualifying mental

22   disorder, was treated at CCCMS level of care, with GAF of 60.  (ECF Nos. 31-2 at 91; 31-12 at

23   12.)  His IDTT also listed GAF of 60, and all of the boxes on the level of care considerations

24   form marked "no."  (ECF No. 31-12 at 13.)

25        On January 18, 2013, a mental health screening form was completed; petitioner reported

26   he had been hospitalized in a psychiatric hospital, hospitalized for drug treatment, and has

27   attempted suicide.  (ECF No. 31-2 at 19.)  The adaptive functional assessment was marked

28   "superior/very good."  (ECF No. 31-2 at 21.)  The identity and title of the person completing this

1   form is unknown, but the initial screening concluded that there was an "indication that [petitioner]

2   is suffering from a mental illness."  (Id. at 22.)

3          On January 24, 2013, Dr. Maez had a confidential interview with petitioner who

4   complained at length and exhibited self-pity for his girlfriend having broken up with him; she was

5   caught smuggling drugs into prison resulting in her arrest and loss of good job and eventually her

6   friends persuaded her to break up with petitioner as a very bad influence.  (ECF No. 31-11 at 2.)

7   Dr. Maez noted his sociopathy and narcissism result in his being angry at the girlfriend for her

8   abandoning him and for narcissistic injury -- no thought to the fact she was bringing drugs at his

9   request.  (Id.)  Dr. Maez found petitioner had extremely poor judgment and poor insight; he was

10  in MHCB from January 8 to 17 -- he had "melt down" when girlfriend's letter arrived; reported

11  thoughts of suicide and would not make a no harm contract; Dr. Maez called crisis team to assess.

12  (ECF No. 31-11 at 2.)  M. Seliktar, Ph.D., noted petitioner was released from crisis bed, put on

13  five day step down (January 18-22, 2013),[8] discharged to CCCMS level of care, put on Remeron;

14  GAF 60.  (ECF No. 31-11 at 3.)  Petitioner denied he would kill himself that day; had no plan,

15  means or intent at that time.  (Id.)  Dr. Seliktar noted petitioner's history of depression and several

16  suicide attempts in the community.  (Id.)

17         On January 24, 2013, mental status exam during suicide risk evaluation noted petitioner

18  has poor impulse control; just returned from MHCB; mood labile; sleep okay; thought process

19  linear; no hallucinations; takes Remeron.  (ECF No. 31-3 at 2-3; see also 31-11 at 1.)  On

20  January 30, 2013, petitioner receiving CCCMS level of care, reported no auditory hallucinations,

21  and medications control his depression; Diagnosis:  depressive disorder, NOS (Axis I).  (ECF No.

22  31-2 at 167, 169.)

23         On February 6, 2013, petitioner was very agitated and complained he was not sleeping

24  and had continual negative commentary with auditory hallucinations; very restless and unable to

25  stop being negatively impacted by the voices.  (ECF No. 31-10 at 46.)  Dr. Maez assessed

26  petitioner as agitated and hallucinatory.  (Id.)

27  ───────────────

28  [8]  During the five day step down, petitioner reported being all right, fine, good and ok.  (ECF No.
    13-11 at 4.)

On February 12, 2013, while housed in ad seg at CCCMS level of care, petitioner was seen by Dr. Hicks at cell door.  (ECF No. 31-10 at 44.)  Petitioner said he was feeling "ok;" eating and sleeping well; denied any depressive, manic, anxiety or psychotic symptoms; denied suicidal ideation; no medication side effects; he appeared stable on current psychiatric medication.  (ECF No. 31-10 at 44.)  Mental status exam:  calm, cooperative, no acute distress; no agitation; mood:  "I'm ok;" affect mood congruent; thought process linear, goal oriented; insight/judgment fair.  (ECF No. 31-10 at 44.)  Dr. Hicks assessed "history of Adjustment Disorder with Depressed Mood, treated with Remeron (a 2nd tier AD that is the only antidepressant that effectively treats his symptoms of depression)."  (ECF No. 31-10 at 45.)  Dr. Hicks continued Remeron 30 mg "for depression and anxiety," continue CCCMS care in ad seg.  (Id.)  Also, Mirtazapine 30 mg renewed.  (ECF No. 31-2 at 4.)

On February 13, 2013, Dr. Maez, noted that petitioner did not feel he needed to come out for a session; petitioner reported that all is fine; presented with normal mood, oriented x 4, and denied suicidal/homicidal ideation with no perceptual disturbances; no feelings of distress; stable.  (ECF No. 31-10 at 43.)

On February 20, 2013, petitioner was housed in ad seg and at CCCMS level of care.  (ECF No. 31-2 at 162.)  Clinical summary notes petitioner began treatment for depression and auditory hallucinations when first incarcerated, in treatment off and on thereafter; history of severe childhood trauma, special education and behavior problems; severely abused by most of his mother's boyfriends; history of abandonments, and physical and emotional abuse, but no reports of sexual abuse; history of violence and gang-related gang violence and multiple juvenile detentions.  (ECF No. 31-2 at 162.)  Motivated and compliant in treatment.  Recently housed in MHCB after his girlfriend arrested trying to smuggle drugs in for petitioner to sell.  Problems noted:  depression, sadness, amotivational, sleep disturbance and psychotic symptoms; prescribed Remeron.  (ECF No. 31-2 at 162.)  Diagnoses:  depressive disorder with psychotic symptoms (Axis I); and antisocial personality disorder ("ASPD") (Axis II); GAF 60, moderate functional impairment.  (ECF No. 31-2 at 164.)  All of the boxes on the level of care considerations form marked "no."  (ECF No. 31-2 at 165.)  At February 20, 2013 IDTT, petitioner accepted/continued

1  in CCCMS level of care.  (ECF No. 31-10 at 39.)

2      Later on February 20, 2013, Dr. Maez noted petitioner was in a very bad mood, with

3  multiple complaints:  nobody is helping him, meds not working, just ready to pop; going crazy in

4  cell and sleeping on the floor; sarcastic, demanding, whiny and very confrontational.  (ECF No.

5  31-10 at 40.)  Dr. Maez charted that petitioner admitted to feeling depressed, very agitated, but

6  earlier in the day he was in better mood with no signs of distress; he was out on yard and

7  interacted comfortably with his peers.  Now, petitioner was "extremely rude, and insulting.

8  Admits to transitory thoughts of death, but denies suicidality or risk to harming others."  (Id.)

9  Oriented x 4.  Dr. Maez' assessment of petitioner was "agitated, rude, demanding and unwilling

10  to review CBT tech[nique]s for thought stopping, etc."  (ECF No. 31-10 at 40.)

11      On February 26, 2013, petitioner refused to come out to therapy session; reported

12  continuing feelings of agitation and depression.  Dr. Maez noted petitioner's mood depressed,

13  with agitation and complaints that medication ineffectual; otherwise oriented x 4, no perceptual

14  disturbances; behaves with hostility demanding and agitation, but denied suicidality.  (ECF No.

15  31-10 at 34.)  Petitioner received mental health referral chrono stating "agitated, hostile,

16  demanding, history of [suicidal ideation]; crisis beds; multiple abandonments, early childhood

17  trauma."  (ECF No. 31-2 at 89.)

18      On March 5, 2013, due to staff referral, Dr. Hicks held interview at cell door with

19  petitioner, who admitted he had been hearing "voices that no one else can hear," and was guarded

20  regarding what the voices were saying, but claimed these experiences caused him to feel anxiety,

21  and to withdraw because of the experiences.  (ECF No. 31-10 at 31.)  Petitioner claimed that

22  risperidone caused him to have EPS and Thorazine caused sedation and sluggishness, but

23  "reported no medication side effects."  (ECF No. 31-10 at 31.)  Mental status exam showed no

24  acute distress; petitioner was cooperative; no agitation; mood anxious because hearing voices;

25  nervous appearing affect; thought process was linear, goal oriented; insight/judgment was fair.

26  (ECF No. 31-10 at 31.) Petitioner has history of schizoaffective disorder, depressed type, treated

27  with Remeron (a 2d tier AD that is the only psychiatric medication that effectively treats the

28  patient's symptoms of depression/anxiety).  (ECF No. 31-10 at 32.)  Prescribed Abilify 10 mg for

21

1   psychosis, Remeron 30 mg for depression and anxiety, and Mirtazapine 30 mg renewed.  (ECF

2   Nos. 31-1 at 22; 31-2 at 3; 31-10 at 32.)

3          On March 13, 2013, petitioner reported he was happy and having a good day; he does

4   have problems with impulse control and is paranoid, but wants to change his behavior.  He wants

5   to get his diploma, but does not always understand what he reads.  (ECF No. 31-10 at 28.)

6   Petitioner presented with no perceptual, thought process, and thought control disturbances, and no

7   memory deficit.  (Id.)  Petitioner encouraged to use coping and anger management skills, and to

8   set short term goal of high school diploma.  (Id.)

9          On March 18, 2013, Beech, ACSW (certified social worker),  met with petitioner in a

10   confidential setting; he reported everything was okay with him; non-compliant with medication

11   because it makes him sick; side effects from Remeron causes him to have headaches, gives him

12   the shakes and diarrhea.  (ECF No. 31-10 at 23.)  Petitioner was alert and oriented x 4;

13   appropriately groomed; clear speech and coherent flow; easily engaged; no memory deficit;

14   presented calm motor activity, average fund of knowledge, euthymic, cooperative and respectful;

15   no perceptual, thought process or thought content disturbances; did not appear to be suicidal or

16   homicidal at the time.  (ECF No. 31-10 at 23.)  Petitioner presented as stable, but was non-

17   compliant in medication treatment; compliant in current treatment plan; continued weekly

18   CCCMS contact.  (Id.)

19          On March 28, 2013, ACSW Beech met with petitioner in confidential setting; he reported

20   everything okay with him; he was angry because people always let him down; no one ever keeps

21   their word to him; reported noncompliance with medication because it makes him sick; side

22   effects from Remeron causes him to have headaches.  (ECF No. 31-10 at 20.)  Petitioner was alert

23   and oriented x 4; appropriately groomed; clear speech and coherent flow; easily engaged; no

24   memory deficit; presented agitated, with average fund of knowledge; angry but cooperative and

25   respectful; no perceptual, thought process or thought content disturbances; did not appear to be

26   suicidal or homicidal at the time.  (ECF No. 31-10 at 20.)  Petitioner presented as stable, but was

27   non-compliant in medication treatment and current treatment plan; continued weekly CCCMS

28   contact.  (Id.)

On April 3, 9 and 15, 2013, ACSW Beech met at cell front with petitioner who refused to speak with clinician because he has not been referred to IDTT for EOP.  (ECF No. 31-10 at 13, 16, 17.)  Petitioner was alert and oriented x 4; appropriately groomed; no memory deficit; presented agitated, angry, belligerent and disrespectful; no perceptual, thought process or thought content disturbances; did not appear to be suicidal or homicidal at the time.  (ECF No. 31-10 at 13, 16, 17.)  Petitioner presented as stable, but was non-compliant in medication treatment and current treatment plan.  (Id.)  On April 22, 2013, petitioner continued at CCCMS level of care.  (ECF No. 31-10 at 10.)

On April 28, 2013, S. Blickhan, Psy.D., met with petitioner in confidential setting; petitioner reported in stable mood, "frustrated."  (ECF No. 31-10 at 8.)  He was removed from yard because he was on heat medication list and it reached 90 degrees; he is taking Abilify and Remeron.  (ECF No. 31-10 at 8.)  Petitioner likes yard and exercises:  "I like the fresh air, it keeps my mind right" from being in his cell, and wants to be taken off the medication.  (Id.)  He denied psychosis and is compliant with medication, with good efficacy and no side effects.  (Id.)  Dr. Blickhan found petitioner to be alert, oriented x 4, linear thought process with no evidence of hallucinations; coherent with no evidence of delusions; presents with average intellectual functioning; speech logical and normal in rate and tone; adequate concentration with no evidence of memory impairment; calm motor activity and full range of affect; well groomed; no evidence of distress; diagnosis:  MDD, recurrent, severe with psychotic features "per MHTS;"[9] no evidence of a mood or thought disorder; presented as stable.  (ECF No. 31-10 at 8.)

On May 2, 2013, S. Blickhan, Psy.D. met with petitioner in confidential setting; petitioner continued to feel frustrated about being on the heat medications list.  He spoke with the psychiatrist who did not discontinue the medication; petitioner taking Abilify and Remeron.  (ECF No. 31-10 at 5.)  Petitioner was alert, oriented x 4, linear thought process with no evidence of hallucinations; coherent with no evidence of delusions; presents with average intellectual functioning; speech logical and normal in rate and tone; adequate concentration with no evidence

---

[9]  "MHTS" is a CDCR acronym meaning "Mental Health Tracking System."  Coleman v. Brown, No. 2:90-cv-0250 LKK DAD P (E.D. Cal. June 10, 2014) (ECF No. 5164).

of memory impairment; calm motor activity and full range of affect; well groomed; no evidence of distress; diagnosis:  MDD, recurrent, severe with psychotic features per MHTS; no evidence of a mood or thought disorder; presented as stable.  (ECF No. 31-10 at 5.)

On May 7, 2013, ACSW Beech met at cell front with petitioner, who refused to speak with clinician until she placed him into EOP.  (ECF No. 31-10 at 4.)  Petitioner was alert and oriented x 4; appropriately groomed; no memory deficit; presented agitated, angry, belligerent and disrespectful; no perceptual, thought process or thought content disturbances; did not appear to be suicidal or homicidal at the time.  (ECF No. 31-10 at 4.)  Petitioner presented as stable, but was non-compliant in medication treatment and current treatment plan.  (Id.)

On May 8, 2013 IDTT, clinical summary noted that petitioner had reported history of childhood abuse and abandonment, special education, behavior problems, gang involvement and violence; anger issues, depression, and anxiety.  (ECF No. 31-2 at 157.)  Petitioner presented alert, oriented x 4, appropriately groomed, without memory deficit, normal eye contact, agitated, angry, belligerent and disrespectful; without perceptual, thought process or thought content disturbances.  Petitioner's problems listed as depression (prescribed Remeron to decrease symptoms), and psychosis (prescribed Abilify to stabilize symptoms).  (ECF No. 31-2 at 157.)  Diagnoses: depressive disorder with psychotic symptoms (Axis I); and ASPD (Axis II); GAF 60, moderate functional impairment.  (ECF No. 31-2 at 159.)  All of the boxes on the level of care considerations form marked "no."  (ECF No. 31-2 at 161.)

On May 10, 2013, petitioner complained that his medications were bothering him.  (ECF No. 31-1 at 88.)

On May 16, 2013, a psychologist noted petitioner's grooming was appropriate, his speech was intelligible, and his comprehension process was adequate, and he was participating at the CCCMS level of care.  (ECF No. 31-2 at 87.)

On May 16, 2013, S. Blickhan, Psy.D. met with petitioner in confidential setting; petitioner felt stressed about being on the heat meds list; he was told to refuse it for 2 weeks with eventual appointment with psychiatry; he was taking Abilify and Remeron.  (ECF no. 31-9 at 77.)  Petitioner was alert, oriented x 4, linear thought process with no evidence of hallucinations;

1   coherent with no evidence of delusions; presents with average intellectual functioning; speech

2   logical and normal in rate and tone; adequate concentration with no evidence of memory

3   impairment; calm motor activity and full range of affect; well groomed; no evidence of distress;

4   diagnosis:  MDD, recurrent, severe with psychotic features per MHTS; no evidence of a mood or

5   thought disorder; presented as stable.  (ECF No. 31-9 at 77.)

6        On May 23, 2013, while housed in general population at CCCMS level of care, petitioner

7   was seen by a psychiatrist.  (ECF No. 31-9 at 74.)  Petitioner stopped taking Abilify after

8   deciding he "didn't need it anymore because he doesn't hear voices."  (ECF Nos. 31-2 at 104; 31-

9   9 at 74.)  Mental status exam: alert; oriented x 4; cooperative; speech spontaneous and normal;

10  mood calm, affect full-ranged, mood congruent; thought process goal directed, linear, logical;

11  thought content:  no delusions or obsessions; no hallucinations; no suicidal or homicidal ideation;

12  cognition intact; insight fair, judgment good; TABE 6.6.   (ECF No. 31-9 at 74.)  Diagnoses:

13  depressive disorder NOS (not otherwise specified), PSD (Axis I); ASPD (Axis II); GAF 65;

14  continue current dose of Remeron.  (ECF No. 31-9 at 68.)  Aripiprazole 10 mg (Abilify) stopped;

15  Mirtazapine 30 mg renewed.  (ECF No. 31-1 at 95, 96.)

16       On June 6, 2013, while housed in general population at CCCMS level of care, petitioner

17  was seen by a psychiatrist; mental status exam: alert; oriented x 4; adequate grooming;

18  cooperative; speech spontaneous and normal; mood calm, affect full-ranged, mood congruent;

19  thought process goal directed, linear, logical; thought content no delusions or obsessions; no

20  hallucinations; no suicidal or homicidal ideation; cognition intact; insight fair, judgment good;

21  TABE 6.6.   (ECF No. 31-9 at 71.)  Diagnoses:  depressive disorder NOS, PSD (Axis I); ASPD

22  (Axis II); GAF 65; medications unchanged.  (ECF No. 31-9 at 72.)

23       At the June 19, 2013 IDTT, a clinical summary noted petitioner's reported history of

24  childhood abuse and abandonment, special education, behavior problems, and gang involvement;

25  anger issues, depression, and anxiety.  (ECF No. 31-2 at 152.)  Problem listed as depression, for

26  which petitioner prescribed Remeron 30 mg.  Petitioner refused to attend IDTT, so there was no

27  mental status exam.   (ECF No. 31-2 at 153.)  Diagnoses:  depression, NOS and polysubstance

28  dependence (Axis I); and ASPD (Axis II); GAF 65.  (ECF No. 31-2 at 154.)  Petitioner on

1    CCCMS level of care; TABE 6.6.  (ECF No. 31-9 at 70.)

2         On August 12, 2013, Tony Rodriguez, LCSW (licensed clinical social worker), saw

3    petitioner, who said, "Man, I'm halfway alright.  I've been stressing out over boredom."  (ECF

4    No. 31-9 at 69.)  Petitioner's girlfriend was banned from visits following her attempt to smuggle

5    in drugs in December 2012; petitioner hasn't heard from her since.  (Id.)  They discussed

6    difficulty coping with incarceration and inmate politics; petitioner attempts to avoid such politics.

7    No thought or mood issues because medicated; not in significant distress.  (Id.)  Rodriguez

8    assessed MDD, recurrent; severe with psychotic features.  (ECF No. 31-9 at 69.)

9         On August 15, 2013, November 8, 2013, January 16, 2014, April 1, 2014, and April 24,

10   2014, Mirtazapine 30 mg was renewed.  (ECF No. 31-1 at 82, 83, 85, 86, 92.)

11        On August 15, 2013, while housed in general population at CCCMS level of care,

12   petitioner was seen by a psychiatrist; mental status exam: alert; oriented x 4; adequate grooming;

13   cooperative; speech spontaneous; mood calm, affect full-ranged, mood congruent; thought

14   process goal directed, linear, logical; thought content no delusions or obsessions; no

15   hallucinations; no suicidal or homicidal ideation; cognition intact; insight fair, judgment good;

16   TABE 6.6.  (ECF No. 31-9 at 67.)  Petitioner diagnosed depressive disorder NOS, PSD (Axis I);

17   ASPD (Axis II); GAF 65; medications unchanged.  (ECF No. 31-9 at 68.)

18        On October 7, 2013, A. Johnson, ACSW, met with petitioner cell side due to modified

19   program.  (ECF No. 31-9 at 66.)  Petitioner was frustrated due to lack of yard; Johnson found

20   petitioner was oriented x 3, alert, mood stable, but frustrated, grooming normal, no hallucinations,

21   speech normal; appeared stable; GAF 55.  (ECF No. 31-9 at 66.)

22        On November 8, 2013, while housed in general population at CCCMS level of care,

23   petitioner was seen by a psychiatrist; mental status exam: alert; oriented x 4; adequate grooming;

24   cooperative; speech spontaneous and normal; mood calm, affect full-ranged, mood congruent;

25   thought process goal directed, linear, logical; thought content no delusions or obsessions; no

26   hallucinations; no suicidal or homicidal ideation; cognition intact; insight and judgment good;

27   TABE 6.6.  (ECF No. 31-9 at 64.)  Petitioner diagnosed depressive disorder NOS, PSD (Axis I);

28   ASPD (Axis II); GAF 65; medications unchanged.  (ECF No. 31-9 at 62.)

1    On December 5, 2013, petitioner was assessed for suicide risk, GAF 55; risk estimated as

2  low.  (ECF No. 31-2 at 219-21.)  A. Johnson, ACSW, met with petitioner on December 5, 2013,

3  and found petitioner oriented x 3, alert, mood stable, calm, grooming normal, no hallucinations,

4  speech logical in rate and tone; patient appeared stable; GAF 55.  (ECF No. 31-9 at 63.)

5    On January 16, 2014, while at CCCMS level of care, petitioner was seen by a psychiatrist;

6  mental status exam: alert; oriented x 4; adequate grooming; cooperative; speech spontaneous;

7  mood calm, affect full-ranged, mood congruent; thought process goal directed, linear, logical;

8  thought content no delusions or obsessions; no hallucinations; no suicidal or homicidal ideation;

9  cognition intact; insight and judgment good.   (ECF No. 31-9 at 61.)  Diagnoses:  depressive

10  disorder NOS, PSD (Axis I); ASPD (Axis II); GAF 65; meds unchanged.  (ECF No. 31-9 at 62.)

11    On February 10, 2014, petitioner reported doing "ok;" A. Johnson, ACSW, found

12  petitioner oriented x 3, alert, mood stable, calm, grooming normal, no hallucinations; Diagnosis:

13  MDD, recurrent; GAF 55.  (ECF No. 31-9 at 60.)

14    On April 1, 2014, while at CCCMS level of care, petitioner was seen by a psychiatrist;

15  mental status exam: alert; oriented x 4; adequate grooming; cooperative; speech spontaneous and

16  normal; mood calm, affect full-ranged, mood congruent; thought process goal directed, linear,

17  logical; thought content no delusions or obsessions; no hallucinations; no suicidal or homicidal

18  ideation; cognition intact; insight and judgment good.   (ECF No. 31-9 at 58.)  Diagnoses:

19  depressive disorder NOS, PSD (Axis I); ASPD (Axis II); GAF 65; medications unchanged.  (ECF

20  No. 31-9 at 59.)  On April 1, 2014, petitioner was prescribed Remeron, 30 mg.  (ECF No. 31-1 at

21  20.)

22    On April 10, 2014, petitioner was housed in ad seg for four counts of refusing to provide a

23  urine sample; prescribed Remeron 15 mg and Strattera 40 mg; appeared stable on his meds and

24  compliant with treatment; oriented x 4, thoughts linear, speech articulate, mood stable, and affect

25  appropriate.  (ECF No. 31-2 at 211.)  Petitioner denied hallucinations or suicidal/homicidal

26  ideation.  (Id.)

27    On April 10, 2014, petitioner, diagnosed with MDD, severe, psychotic features (Axis I);

28  GAF 55, was retained in CCCMS and had been stable at CCCMS level of care.  (ECF No. 31-2 at

212, 217.)  Petitioner taking Mirtazapine 30 mg.  (ECF No. 31-2 at 214.)  All of the boxes on the mental status exam form were marked "within normal limits" and "none," except that his affect was mildly restricted, and his mood calm.  (ECF Nos. 31-2 at 215; 31-9 at 57.)

On April 24, 2014, while housed in general population at CCCMS level of care, petitioner seen by psychiatrist; mental status exam: alert; oriented x 4; adequate grooming; cooperative; speech spontaneous and normal; mood calm, affect full-ranged, mood congruent; thought process goal directed, linear, logical; thought content no delusions or obsessions; no hallucinations; no suicidal or homicidal ideation; cognition intact; insight and judgment good.  (ECF No. 31-9 at 55.)  On April 25, 2014, petitioner was diagnosed with depressive disorder NOS, PSD (Axis I); ASPD (Axis II); GAF 65; medications unchanged.  (ECF No. 31-9 at 56.)

Petitioner's May 29, 2014 mental health treatment plan noted history of mental health and special education services, gang involvement and violence, and treatment for anger issues, depression and anxiety.  (ECF No. 31-2 at 147.)  Petitioner's problem was depressed mood; he received Mirtazapine 30 mg at bed time for decreasing mood symptoms.  (ECF No. 31-2 at 147.)  All of the mental status exam boxes were marked "within normal limits," including cognition, thought processes, and insight and judgment; there were no hallucinations, delusions, obsessions or magical thinking; TABE 7.6.  (ECF No. 31-2 at 148.)  Diagnosis was mood disorder (Axis I); Axis II deferred; incarceration, ad seg housing (Axis IV) and GAF 65.  (ECF No. 31-2 at 149.)  All of the boxes on the level of care considerations form marked "no."  (ECF No. 31-2 at 150.)

On June 13, 2014, in confidential setting, Dr. Valdes met with petitioner, who reported the Remeron gives him appetite.  (ECF No. 31-9 at 52.)  Dr. Valdes charted petitioner was frustrated that he doesn't have opportunity to work; reports long-lived history of difficulty concentrating.  (ECF No. 31-9 at 52.)  Diagnoses:  ADD; Schizoaffective Disorder, depressive type; start Strattera 40 mg; reduce Remeron to 15 mg.  (ECF No. 31-9 at 48.)  On June 16, 2014, Mirtazapine 30 mg stopped; prescribed Remeron 15 mg and Strattera 40 mg.  (ECF No. 31-1 at 81.)  On June 25, 2014, progress notes petitioner working on his GED.  (ECF No. 31-9 at 51.)

On June 26, 2014, a psychiatrist performed mental status exam:  alert; oriented x 4; adequate grooming; cooperative; speech spontaneous and normal; mood calm, affect full-ranged,

28

appropriate, mood congruent; thought process goal directed, linear, logical; thought content no

delusions or obsessions; no hallucinations; no suicidal or homicidal ideation; cognition intact;

insight and judgment good.  (ECF No. 31-9 at 49.)  Diagnoses:  Mood disorder NOS; PSD (Axis

I); ASPD (Axis II): GAF 65.  (ECF No. 31-9 at 50.)  Medications unchanged.  (Id.)

On June 26, August 7, and September 17, 2014, Strattera 40 mg and Mirtazapine 15 mg

renewed.  (ECF No. 31-1 at 77, 78, 80.)

On July 11, 2014, Dr. Valdes met with petitioner in confidential setting; he reported "the

Strattera isn't doing anything," no side effects, either.  (ECF No. 31-9 at 47.)  Dr. Valdes charted

petitioner just lost his sister to ovarian cancer; he felt defeated and overwhelmed by prison term;

wants to wait another month before another increase in Strattera tried.  (ECF No. 31-9 at 47.)

Diagnoses:  ADD; depressive disorder; continue Strattera and Remeron.  (ECF No. 31-9 at 48.)

Petitioner encouraged to work on his case; Dr. Valdes charted:  "the sentence is exorbitant."

(ECF No. 31-9 at 48.)

On July 30, 2014, M. Pulling, Psy.D. met with petitioner who stated, "It has nothing to do

with me being in CCCMS.  I've read it twice and I don't get it."  (ECF No. 31-9 at 46.)  Dr.

Pulling found petitioner oriented x 4, thought processes linear and goal directed; thought content

logical, speech articulate, mood stable; denied hallucinations; evidence of a thought disorder;

Diagnoses:  Mood disorder NOS (provisional) (Axis I), and ASPD (Axis II); GAF 55.  (ECF No.

31-9 at 46.)

On August 7, 2014, Dr. Valdes met cell side with petitioner, who reported "I want to stay

with my meds; I didn't need to come out."  (ECF No. 31-9 at 44.)  Dr. Valdes charted petitioner

came promptly to door; mood slightly irritable; clean appearance; diagnoses:  depressive disorder,

NOS; ADD; continue Strattera and Remeron.  (ECF No. 31-9 at 44-45.)

On August 20, 2014, Dr. Valdes met cell side with petitioner, who reported "I'm okay."

(ECF No. 31-9 at 42.)  Dr. Valdes charted petitioner came to door promptly when called; no signs

of distress; he had been sleeping; diagnoses:  depressive disorder; ADD; continue meds.  (ECF

No. 31-9 at 42-43.)  On August 28, 2014, petitioner refused psych assessment.  (ECF No. 31-9 at

40-41.)

A September 10, 2014 progress note reflects petitioner addressed issue of parole; he has a long time to go but is willing to start preparing for parole; he is trying to complete GED.  (ECF No. 31-9 at 39.)  On September 11, 2014, while housed in general population at CCCMS level of care, petitioner was seen by a psychiatrist; mental status exam: alert; oriented x 4; adequate grooming; cooperative; speech spontaneous and normal; mood calm, affect full-ranged, mood congruent; thought process goal directed, linear, logical; thought content no delusions or obsessions; no hallucinations; no suicidal or homicidal ideation; cognition intact.  (ECF No. 31-9 at 37.)  On September 12, 2014, petitioner diagnosed mood disorder NOS, rule out PSD (Axis I); rule out ASPD (Axis II); GAF 70; medications unchanged.  (ECF No. 31-9 at 38.)

On September 17, 2014, Dr. Valdes met cell side with petitioner, who reported "I'm having some problems right now with some people in the streets; don't want to get into it."  (ECF No. 31-9 at 35.)  Dr. Valdes charted:  "discussed importance of sharing emotional burden, but petitioner was adamant; appropriate; said he would reach out if necessary."  (ECF No. 31-9 at 35.)  Diagnoses:  Mood Disorder, NOS; ADD; continue Strattera and Remeron.  (ECF No. 31-9 at 36.)

On October 1, 2014, Dr. Valdes met cell side with petitioner, who reported "I'm feeling good; everything is okay."  (ECF No. 31-9 at 33.)  Dr. Valdes charted petitioner was animated; appropriate; good spirits; diagnoses:  mood disorder, NOS; continue Strattera and Remeron. (ECF No. 31-9 at 33-34.)

On October 9, 2014, petitioner, housed in general population at CCCMS level of care, was seen cell side by A. Dusovich, M.D.  (ECF No. 31-9 at 31-32.)  Mental status exam: alert; oriented x 4; adequate grooming; cooperative; speech spontaneous and normal; mood calm, affect full-ranged, appropriate, mood congruent; thought process goal directed, linear, logical; thought content no delusions or obsessions; no hallucinations; no suicidal or homicidal ideation; cognition intact.  (ECF No. 31-9 at 31.)  Diagnoses:  mood disorder NOS; noncompliance with meds; history of SSA (Axis I); rule out ASPD (Axis II): GAF 65.  (ECF No. 31-9 at 32.)  Medications unchanged.  (Id.)

On October 15, 2014, Dr. Valdes met cell side with petitioner, who reported "I'm doing

1    fine." (ECF No. 31-9 at 29.)  Dr. Valdes charted petitioner came to door promptly; in good

2    spirits; "Don't need to see you, done," appropriate; diagnoses:  Mood Disorder, NOS; continue

3    medications.  (ECF No. 31-9 at 29-30.)

4           On October 23, 2014, petitioner, housed in ad seg at CCCMS level of care, was seen for

5    medication noncompliance; he insisted on being seen cell side where he claimed he did not take

6    Remeron for 3 days because he was sick (10/16-18/2014), but wishes to continue taking

7    Remeron, and intends to redouble efforts to take Remeron regularly.  (ECF No. 31-9 at 27.)

8    Generally, petitioner eating and sleeping well; he denied any depressive, manic, anxiety, or

9    psychotic symptoms, suicidal or homicidal ideation, or medication side effects.  (ECF No. 31-9 at

10   27.)  Petitioner's thought process described as linear, goal oriented; insight/judgment was fair.

11   (ECF No. 31-9 at 27.)  Dr. Hicks assessed "history of Mood Disorder NOS, treated with Strattera

12   and Remeron (a 2nd tier AD that is the only antidepressant that effective treats the patient's

13   symptoms of depression)." (ECF No. 31-9 at 28.)  Dr. Hicks continued Strattera 40 mg and

14   Remeron 15 mg "for attention/concentration/antidepressant augmentation and depression

15   respectively," and continue CCCMS level of care.  (ECF No. 31-9 at 28.)  On October 23, 2014,

16   Strattera 40 mg and Mirtazapine 15 mg prescriptions continued "until January 23, 2015."  (ECF

17   No. 31-1 at 76.)

18          On November 7, 2014, Dr. Valdes met cell side with petitioner, who reported "The meds

19   are good; I'm fine." (ECF No. 31-9 at 25.)  Dr. Valdes charted petitioner in good spirits;

20   appropriate; clean appearance; diagnoses:  Depressive Disorder; ADD; continue Strattera and

21   Remeron.  (ECF No. 31-9 at 25-26.)

22          On November 21, 2014, Dr. Valdes met cell side with petitioner, who reported "I'm

23   good." (ECF No. 31-9 at 23.)  Dr. Valdes charted petitioner in good spirits; appropriate; wants to

24   remain on meds; diagnoses:  depressive disorder; ADD; continue meds.  (ECF No. 31-9 at 23-24.)

25          On December 2, 2014, A. Johnson, ACSW (associate clinical social worker), met with

26   petitioner in the housing unit, where petitioner said he was doing ok, but sometimes has bad days;

27   he described a bad day:  "he is non-operative, isolates, doesn't speak with his cellie, doesn't use

28   the head, or leave the cell." (ECF No. 31-9 at 22.)  Johnson found petitioner to be oriented x 4,

1   mood was very mildly dysphoric, denied hallucinations; appeared stable at time of this visit;

2   Diagnoses:  MDD, recurrent (Axis I); GAF 55.  (ECF No. 31-9 at 22-23.)

3          On December 12, 2014, Dr. Valdes met cell side with petitioner, who reported "I'm doing

4   fine," came to cell door when called; "C/fair."  (ECF No. 31-9 at 20.)  Dr. Valdes' diagnoses:

5   Depression Disorder; ADD; continue Strattera/Remeron.  (ECF No. 31-9 at 20-21.)

6          On December 12, 2014, January 29, 2015, and February 26, 2015, Strattera 40 mg and

7   Mirtazapine 15 mg renewed.  (ECF No. 31-1 at 73, 74, 75.)

8          On May 24, 2013; June 8, 11, 15, 16, 2014; July 6, 9, 2014; August 5, 17, 2014;

9   September 6, 13, 14, 27, 2014; October 5, 9, 11, 18, 29, 2014; November 1, 8, 14, 20, 2014;

10  December 6,[10] 2014; January 21, 24, 30, 2015; and February 20, 2015, petitioner received a

11  chrono for refusing, or was a no show, for administered medication.  (ECF No. 31-1 at 56, 57, 58,

12  59, 61, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72-73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86.)

13         On January 23, 2015, Dr. Valdes met cell side with petitioner, who reported "I'm alright;

14  want to stay on my meds."  (ECF No. 31-9 at 17.)  Dr. Valdes noted no sign of distress; continue

15  meds; Diagnoses:  depression disorder; ADD.  (ECF No. 31-9 at 17-18.)

16         On February 5, 2015, Dr. Valdes met cell side with petitioner, who reported "no

17  problems; good appetite."  (ECF No. 31-9 at 15.)  Dr. Valdes noted no sign of distress; continue

18  Strattera and Remeron; Diagnoses:  depression disorder; ADD.  (ECF No. 31-9 at 15-16.)

19         On February 20, 2015, Dr. Valdes met cell side with petitioner regarding his decision on

20  noncompliance; petitioner wanted to remain on medications; Dr. Valdes charted "no signs of

21  acute distress."  (ECF No. 31-9 at 12.)  Diagnoses:  depression disorder; ADD; continue Strattera

22  and Remeron.  (ECF No. 31-9 at 12-13.)

23         On February 24, 2015, petitioner "stated that he was doing fine;" "he is on medication and

24  it helps him;" "copes with his problems by going to the yard and trying to stay busy;" "has no

25  major concerns at this time."  (ECF No. 31-9 at 14.)

26  _____

    [10]  Another chrono was dated 12/5/2014 by LVN E. Grant, but the form claims petitioner refused
27  or was a no show on 12/3/14, 12/14/14, and 12/15/14.  (ECF No. 31-2 at 62.)  A psychiatrist
    signed and dated the chrono 12/12/14.  (Id.)  Because these dates cannot be reconciled, the court
28  does not consider this chrono.

1    In the March 16, 2015 ad seg pre-placement chrono, petitioner's TABE is listed as 6.6.

2    (ECF No. 31-2 at 55.)

3    On March 23, 2015, C. Kyriacou, Psy.D. found petitioner oriented x 4, thoughts linear,

4    speech articulate, mood stable; denied hallucinations; Diagnoses:  Mood disorder NOS

5    (provisional) (Axis I), and ASPD (Axis II); GAF 55.  (ECF No. 31-9 at 9-10.)

6    On March 26, 2015, Staff Psychologist Cao, Psy. D., noted petitioner's grooming was

7    appropriate, speech intelligible, and comprehension process was adequate, and was participating

8    at the CCCMS level of care.  (ECF No. 31-2 at 54.)  On March 30, 2015, petitioner reported he

9    stopped taking Remeron because it makes him sleep all the time.  (ECF No. 31-2 at 53.)  He was

10   prescribed Mirtazapine, 15 mg.  (ECF No. 31-1 at 72.)

11   On April 1, 2015, medical health placement chrono reflects CCCMS level of care, GAF

12   55, and psychotropic medications prescribed.  (ECF No. 31-2 at 52, 144.)  C. Kyriacou, Psy.D.

13   found petitioner well-groomed, positive/cooperative, orientation within normal limits; affect was

14   elevated, mood anxious, does not sleep.  (ECF No. 31-2 at 143.)  Dr. Kyriacou marked all of the

15   cognition/sensorium, and thought processes boxes as within normal limits, but petitioner's insight

16   and judgment were poor.  (Id.)  Diagnoses:  major depression, recurrent, mild; attention-deficit

17   hyperactivity disorder, predominantly inattentive; polysubstance dependence in full remission in a

18   controlled environment (Axis I); and ASPD (provisional) (Axis II).  (ECF No. 31-2 at 144.)

19   IDTT marked "no" on all boxes of Level of care considerations, reflecting petitioner was able to

20   adequately function at CCCMS level of care or that he did not demonstrate chronic psychiatric

21   symptoms that have not responded to at least six months of treatment.  (ECF No. 31-2 at 145.)

22   On April 1 and 8, 2015, C. Kyriacou, Psy.D. found petitioner was oriented x 4, thoughts

23   linear, speech articulate, mood stable; denied hallucinations; Diagnoses:  MDD, recurrent, mild;

24   ADHD, predominantly inattentive; polysubstance dependence in full remission in controlled

25   environment (Axis I), and ASPD (Axis II); GAF 55; CCCMS.  (ECF No. 31-9 at 3, 6.)

26   On April 16, 2015, Staff Psychiatrist V. Ahuja, M.D., noted petitioner's complaints of

27   anxiety and difficulty sleeping; displaying poor attention and hyperactivity.  (ECF No. 31-8 at

28   66.)  Dr. Ahuja found petitioner's mood anxious; thought process distractable; although no

delusions were detected, petitioner reported seeing shadows; as to cognition, "poor attention and concentration." (Id.) Diagnoses:  MDD, recurrent, mild; ADHD, Polysubstance Dependence (Axis I); ASPD (Axis II); GAF 50.  (Id.)  Dr. Ahuja noted petitioner has not cursed since he was redirected last visit, and complimented petitioner on effective change of behavior.  (Id.)  On April 16, 2015, Strattera increased from 40 to 60 mg, and prescribed Vistaril 50 mg for anxiety.  (ECF No. 31-1 at 69; 31-8 at 67.)

On April 17 and 23, 2015, C. Kyriacou, Psy.D. found petitioner oriented x 4, thoughts distracted/racing, speech pressured but redirectable, mood anxious, affect somewhat elevated; reported visual and auditory hallucinations, but did not appear to respond to internal stimuli; Diagnoses:  MDD, recurrent, mild; ADD, predominantly inattentive; polysubstance dependence in full remission in controlled environment (Axis I), and ASPD (Axis II); GAF 50.  (ECF No. 31-8 at 63, 65.)

On April 30, 2015, C. Kyriacou, Psy.D. found petitioner oriented x 4, thoughts distracted/racing but redirectable, speech pressured but redirectable, mood anxious, affect somewhat elevated; reported visual and auditory hallucinations, but did not appear to respond to internal stimuli; Diagnoses:  MDD, recurrent, mild; ADD, predominantly inattentive; polysubstance dependence in full remission in controlled environment (Axis I), and ASPD (Axis II); GAF 55.  (ECF No. 31-8 at 61.)

On May 4, 2015, petitioner reported he had not had meds for three weeks and felt anxious and had mood swings.  (ECF No. 31-2 at 50.)  On May 4 and 12, 2015, C. Kyriacou, Psy.D. found petitioner oriented x 4, thoughts distracted but redirectable, speech pressured, mood anxious, affect elevated; reported visual and auditory hallucinations, but did not appear to respond to internal stimuli; Diagnoses:  MDD, recurrent, mild; ADD, predominantly inattentive; polysubstance dependence in full remission in controlled environment (Axis I), and ASPD (Axis II); GAF 55.  (ECF No. 31-8 at 57, 59.)  May 22, 2015, continue at CCCMS level of care.  (ECF No. 31-8 at 55.)

On May 28, 2015; June 4, 12, and 18, 2015, C. Kyriacou, Psy.D. found petitioner to be oriented x 4, thoughts linear, speech articulate, mood stable; denied hallucinations; diagnoses:

MDD, recurrent, mild; ADD, predominantly inattentive; polysubstance dependence in full

remission in controlled environment (Axis I), and ASPD (Axis II); GAF 55; CCCMS.  (ECF No.

31-8 at 46, 49, 51, 53.)

On June 17, 2015, petitioner's mental health chrono reflects qualifying mental disorder,

treated at CCCMS level of care, GAF 60, and psychotropic medication Vistaril 50 mg and

Strattera 60 mg prescribed.  (ECF No. 31-2 at 49, 137, 139.)  TABE 6.6.  Problems identified as

depression, evidenced by low motivation, sad mood, anhedonia, disrupted sleep patterns; and

attention and focus deficits, evidenced by impulsivity, difficulty completing tasks, and consistent

redirection.  (ECF No. 31-2 at 137.)  He was compliant with all aspects of treatment, and

appeared stable on his medications.  (Id.)  Diagnoses:  major depression, recurrent, mild; ADHD,

predominantly inattentive; polysubstance dependence in full remission in a controlled

environment; (Axis I); and ASPD (provisional) (Axis II).  (ECF No. 31-2 at 139.)

On June 23, 2015, C. Kyriacou, Psy.D. found petitioner oriented x 4, thoughts linear,

speech articulate, mood stable; denied hallucinations; diagnoses:  MDD, recurrent, mild; ADD,

predominantly inattentive; polysubstance dependence in full remission in controlled environment

(Axis I), and ASPD (Axis II); GAF 60.  (ECF No. 31-8 at 44.)

On July 16, and 23, 2015, C. Kyriacou, Psy.D. found petitioner, housed in general

population, oriented x 4, thoughts linear, speech articulate, mood stable; diagnoses:  MDD,

recurrent, mild; ADD, predominantly inattentive; polysubstance dependence in full remission in

controlled environment (Axis I), and ASPD (Axis II); GAF 65.  (ECF No. 31-8 at 33, 36.)

On July 24, 2015, petitioner was housed in a MHCB crisis bed, GAF 30, due to his self-

inflicted superficial cuts to both wrists and neck.  (ECF No. 31-2 at 45, 46; 31-12 at 93 (GAF

45).)  Petitioner's initial IDTT at admission suggested staff "consider the presence of secondary

gain given his current ad seg term and multiple pending 115s."  (ECF No. 31-13 at 14.)  On July

27, 2015, R. Farrell, Psy.D. charted that in response to why petitioner came to MHCB, he

responded:  "Tried to kill myself."  "Lancaster."  "Voices in my head."  "When can I get

something to read."  (ECF No. 31-13 at 37.)  Dr. Farrell diagnosed petitioner with MDD,

recurrent, mild, polysubstance dependence (Axis I), and ASPD (Axis II); GAF 30, and noted:

"Unstable.  Per previous clinician's intake [petitioner] may be trying to get out of serving time in ad seg.  Currently presenting very depressed but also asking for something to do."  (Id.)  Various evaluations were performed as petitioner was on suicide watch from July 24 to August 7, 2015.  (ECF Nos. 31-2 at 208-10; 31-8 at 30-32; 31-12 at 77, 86-89; 31-14 at 7.)  While he remained housed in the MHCB, his GAF scores were 28 (July 28), 30 (July 29), 35 (July 30), 30 or 35 (July 31), 35 (August 1, 2); 35-40 (August 3); 30 (August 4); 35 (August 5).  (ECF No. 31-13 at 22, 24, 26, 27, 29, 31, 32, 33, 35, 36.)

On August 6, 2015, petitioner was discharged from MHCB to EOP; discharge diagnoses: MDD, recurrent, mild; polysubstance dependence (by history) (Axis I); ASPD (Axis II): GAF 45.  (ECF Nos. 31-12 at 79; 31-13 at 21.)  L. Wang, Ph.D. noted an ongoing consideration of the presence of secondary gain given current ad seg term and multiple pending 115s.  (Id., & 31-13 at 21.)  Petitioner was compliant with all MHCB treatment, and appeared motivated for treatment based on his statements and compliance with MHCB treatment; would benefit from EOP treatment.  (ECF No. 31-13 at 21.)  Petitioner was taking Strattera 40 mg for ADHD; benztropine 1 mg for EPS; escitalopram (Lexapro) 10 mg for depression; Remeron 30 mg for depression; and Zyprexa 10 mg for psychosis.  (ECF Nos. 31-12 at 92; 31-13 at 41.)  His prescriptions for Mirtazapine 30 mg and Olanzapine (Zyprexa)10 mg were renewed.  (ECF Nos. 31-12 at 79; 31-13 at 40-41.)

On August 12, 2015, R. Girod, Psy.D. performed a mental health exam noting petitioner's mood disorder and suicidality while housed in ad seg.  (ECF No. 31-2 at 197.)  Petitioner reported he dropped out of 6th grade to care for younger siblings; repeated 4th and 5th grade, but was in regular mainstream classes; was hit in the head with a bat on the streets and was in a coma for 9 months after head trauma event at age 17.  (ECF No. 31-2 at 198, 199.)  Mental health exam noted adequate cooperation, but petitioner "appeared to over report mental health symptoms."  (ECF No. 31-2 at 201.)  His cognition was alert, oriented x 4, logical, linear and goal directed with no evidence of hallucinations, delusions or grandiosity; adequate concentration with no evidence of memory impairment.  His thought processes were within normal limits; good judgment and insight into navigating prison environment.  (ECF No. 36-2 at 202.)  Dr. Girod

1   noted petitioner spent most of his life incarcerated, and review of his c-file reveals he may hold a

2   high ranking position within the gang with which he associates.  (ECF No. 36-2 at 203.)

3   Diagnoses:  MDD, recurrent, moderate, without psychotic features; Amphetamine Dependence

4   (Axis I); and ASPD (Axis II); GAF 47; functional impairment: moderate for behavioral control

5   and interpersonal; mild for mental illness symptoms.  (ECF No. 31-2 at 205.)  Petitioner to remain

6   at EOP level of care.  (Id.)  He was prescribed Zyprexa 20 mg and Remeron 45 mg; Mirtazapine

7   (antidepressant), 30 mg, and olanzapine (Zyprexa), 10 mg (atypical antipsychotic) were stopped.

8   (ECF No. 31-1 at 51.)

9          On August 12, 2015, petitioner was in ad seg for possession of contraband, participating

10   in gang activity, and refusal to accept assigned housing; being treated for MDD, auditory

11   hallucinations, and ADD; petitioner reported still feeling depressed, felt others poisoning his

12   food, others plotting against him, and having panic attacks, and the voices constant, saying

13   negative things about him.  (ECF No. 31-8 at 26.)  Dr. Chang performed a routine initial

14   psychiatric evaluation; working diagnosis schizoaffective disorder; petitioner still having

15   symptoms of depression and psychosis; GAF 55; Remeron increased to 45 mg per petitioner's

16   request; Strattera increased to 80 mg, Zyprexa increased to 20 mg to reduce voices; Cogentin

17   made PRN, and Lexapro maintained.  (ECF No. 31-8 at 26-28.)

18          On August 19, 2015, GAF was 47.  (ECF No. 31-2 at 44, 128.)  Diagnoses:  MDD,

19   recurrent; schizoaffective disorder, depressive type, and amphetamine dependence (Axis I); and

20   ASPD (Axis II); his problems were identified as depression, amphetamine dependence and

21   childhood trauma history.  (ECF No. 31-2 at 128-29.)  His psychiatric medications were

22   benztropine 1 mg for EPS; Remeron 45 mg for depressive symptoms of intrusive thoughts at

23   night; Zyprexa 20 mg for psychotic symptoms; and Lexapro 10 mg for depressive symptoms of

24   sadness, negative intrusive thoughts.  (ECF No. 31-2 at 136.)  On August 18, 26, 31, 2015,

25   petitioner found alert, oriented x 4, logical, linear and goal directed in his cognitions, no evidence

26   of hallucinations; GAF 45; stable.  (ECF No. 31-7 at 94; 31-8 at 7, 20.)

27          On February 18, 2016, petitioner was excluded from the Disability Placement Program.

28   (ECF No. 31-18 at 2-3.)

1        5. Plaintiff's Administrative Grievances

2            On August 16, 2015, petitioner filed grievance LAC S-15-03307, claiming that after he

3    was taken to the infirmary on July 23, 2015 on suicide watch, and then transferred to CHCF, his

4    personal property was taken out of his cell.  (ECF No. 31-17 at 5.)  Petitioner provided an

5    inventory of his missing property, and sought the return or replacement of his personal property,

6    noting that officers "should know the difference between property or trash."  (Id.)  Petitioner

7    pursued this grievance at least through second level review.  (ECF No. 31-17 at 5-47.)

8            On July 22, 2015, petitioner filed a grievance claiming he was denied access to the law

9    library in ad seg and denied law library paging.  (ECF No. 31-17 at 48.)  The appeal was

10   withdrawn on August 19, 2015, because petitioner received his material.  (ECF No. 31-17 at 49.)

11          On April 23, 2015, petitioner appealed CDCR-115, Rules Violation Report ("RVR") No.

12   D15-03-0063, for refusing to submit a urine sample, grievance LAC S-15-01558, at least through

13   second level review.  (ECF No. 31-17 at 52-65.)

14          On August 21, 2014, in grievance LAC D-14-02848, petitioner appealed RVR No. W12-

15   12-0005, dated December 9, 2012, for introduction of a controlled substance with intent to

16   distribute, at least through the second level of review.  (ECF No. 31-17 at 72-94.)

17          On July 15, 2013, in grievance LAC-B-13-02447, petitioner appealed RVR No. S13-03-

18   0036, dated March 19, 2013, for "willfully delaying any peace officer by refusing to accept

19   assigned housing," at least through the second level of review.  (ECF No. 31-17 at 95-110.)

20          6. Discussion

21          a. Severe Mental Impairment

22          "Mental illness itself is not a unitary concept.  It varies in degree.  It can vary over time. It

23   interferes with an individual's functioning at different times in different ways."  Indiana v.

24   Edwards, 554 U.S. 164, 175 (2008).  Petitioner's mental health history is no different.

25          Petitioner's mental health records reflect that in December of 2011, he was diagnosed as

26   suffering from major depressive disorder, recurrent severe with psychotic features, with moderate

27   functional impairment due to mental illness symptoms; he was admitted to the CCCMS level of

28   care, but managed without medication.  However, by January of 2012, he was prescribed

38

1  psychotropic medication:  Risperdal, an antipsychotic, and Remeron, an antidepressant, based on

2  diagnoses of psychotic and depressive disorders.  At some point he was also prescribed

3  Mirtazapine, for mood disorder, which was stopped on February 6, 2012, and hydroxyzine

4  pamoate for anxiety, renewed in August.  He reported hearing voices, felt paranoid; tried to read

5  but couldn't concentrate; and saw "shadows"; by April, his diagnosis was changed to depressive

6  disorder, no evidence of genuine psychosis.  Petitioner reported a "lazy" feeling from the

7  Remeron, which was decreased to 15 mg, and was prescribed Vistaril for nocturnal agitation.  In

8  September, he reported he stayed to himself to avoid trouble.  In December, Dr. Hicks noted

9  petitioner felt restless in the night and obsessively ruminated about his life.  By the end of

10  December, petitioner was not sleeping well, and was assessed as paranoid, hypervigilant, and

11  agitated, which largely resulted from a recent cellmate.  Despite such symptoms, his GAF scores

12  in 2012 fluctuated from a low of 55 to a high of 60.  However, on January 8, 2013, petitioner was

13  admitted to a crisis bed due to adjustment disorder with disturbance of conduct; GAF 25; Dr.

14  Davidson later noted that petitioner's voices were not hallucinations, and found petitioner had a

15  history of acting out and having poor coping skills.  His GAF score improved to 45, and by

16  January 17, 2013, petitioner was released from the MHCB, and Dr. Liflyandsky opined that there

17  was no strong evidence that petitioner actually exhibited major depressive disorder, assigning a

18  GAF of 70.  However, petitioner's mental health chrono and IDTT, as well as Dr. Maez, listed

19  petitioner's GAF as 60.  By January 30, 2013, petitioner reported that medications control his

20  depression, and he had no auditory hallucinations; his diagnosis was depressive disorder.

21      Nevertheless, here, the relevant time period is between February 6, 2013, when the one-

22  year limitations period began, and June 28, 2015, the date the instant petition was constructively

23  filed.  See Laws, 351 F.3d at 923 (Despite evidence of serious mental illness, in 1993, Laws was

24  adjudicated competent to stand trial, but such finding did not determine Laws' competence from

25  1996-2000, when his habeas petitions should have been filed.)  However, in a case factually

26  similar to this one, the Ninth Circuit focused on the one year during which the limitations ran.

27  Orthel, 795 F.3d at 938.  Thus, the undersigned focuses on the one year period when the statute of

28  limitations ran for this petitioner, from February 6, 2013, and February 6, 2014, during which he

1    was at the CCCMS level of mental health care.

2          At the beginning of the limitations period, on February 6, 2013, petitioner was assessed as

3    agitated and hallucinatory, and was not sleeping, but by February 12, 2013, housed in ad seg, he

4    was "ok," his thought process was linear, insight/judgment fair; Dr. Hicks assessed petitioner

5    with a history of adjustment disorder with depressed mood, and noted petitioner was stable on

6    current psychiatric medication, and continued Remeron and Mirtazapine.  On February 20, while

7    housed in ad seg, petitioner was diagnosed with depressive disorder with psychotic symptoms and

8    ASPD; moderate functional impairment.  On March 5, 2013, petitioner was again hearing voices;

9    Dr. Hicks noted petitioner had a history of schizoaffective disorder, depressed type, and

10   prescribed Abilify for psychosis; Remeron for depression and anxiety, and Mirtazapine was

11   renewed.  On March 18, petitioner presented as stable, but was noncompliant with medications

12   because he reported they were making him sick.  On April 3, 9 and 15, 2013, petitioner presented

13   as stable, but was again noncompliant with medication.  In early April, petitioner wanted to be

14   referred to IDTT for EOP; by late April, he wanted to be removed from medication so he could

15   remain on yard when the weather got hot.  By May 2, 2013, Dr. Blickhan reported no evidence of

16   hallucinations; petitioner stable, and listed the diagnosis from the mental health tracking system:

17   MDD, recurrent, severe with psychotic features.  However, at the May IDTT, petitioner was

18   diagnosed with depressive disorder with psychotic symptoms and ASPD; he continued to

19   complain his medications were bothering him.  On May 23, 2013, housed in general population,

20   petitioner stopped taking Abilify, but continued taking Remeron and Mirtazapine.  On June 6,

21   August 15, November 8, 2013, and January 16, 2014, petitioner was oriented x 4, thought process

22   goal directed, linear, logical; thought content no delusions or hallucinations or obsessions;

23   cognition intact; insight fair or good; judgment good; diagnosed depressive disorder; PSD;

24   ASPD.  His medications from June 13, 2013, through January 16, 2014, remained unchanged.

25   From February 6, 2013, to February 6, 2014, petitioner's GAF levels were usually 65, with the

26   exception of February 20, 2013 (GAF 60), and October 7 (on modified program) and December

27   5, 2013 (GAF 55).

28          Such records do not reflect that petitioner's mental impairment was so severe that he was

1    unable to rationally or factually able to understand the need to timely file or rendered him unable

2    to prepare a habeas petition and file it.  Rather, the records show he was oriented, his thought

3    processes were linear, his functional impairment was moderate, and his cognition intact.  Despite

4    the shifting diagnoses, the recurrent diagnosis from June 6, 2013 through the end of the

5    limitations period was depressive disorder.  The records show he was stable on medication,

6    particularly from June 6, 2013, through January of 2014.  See Fite v. Martel, 2011 WL 1648581,

7    at *6 n.10 (C.D. Cal. Mar. 24 2011) (taking psychiatric medication alone insufficient to

8    demonstrate that the petitioner was entitled to equitable tolling, especially given that the

9    medication stabilized his condition during the relevant time period), Report and Recommendation

10   adopted by 2011 WL 1642373 (C.D. Cal. Apr. 29, 2011).

11           As argued by respondent, petitioner was included in the CCCMS level of care from 2011

12   through July of 2015, and it was not until August of 2015 that he was placed in the EOP level of

13   care, and even then, petitioner's mental health was charted as stable.  Treatment at the CCCMS

14   level of care "suggests that petitioner was able to function despite his mental health problems."

15   Washington, 2010 WL 1999469, at *2 (citing Coleman, 922 F. Supp. 2d at 903 n.24 (inmates

16   designated to the CCCMS level of care "are those 'whose symptoms are under control or in

17   partial remission and can function in the general prison population, administrative segregation, or

18   segregated housing unit'").  Petitioner appears to argue that he did not receive EOP treatment

19   until 2015, when the Coleman attorney and petitioner's psychiatrist exerted pressure to do so,

20   suggesting that petitioner believes he should have earlier been assigned to EOP status.  Petitioner

21   does not identify the psychiatrist, or at what point he believes he should have been EOP.  The

22   mental health records do not reflect a recommendation by a psychiatrist that petitioner be

23   assigned EOP that was not followed.  Moreover, while the mental health records reflect

24   differences of opinion among treating mental health professionals about petitioner's diagnosis,

25   the record does not reflect a difference of opinion as to his level of care.  Rather, the record

26   reflects that petitioner sought EOP status on December 18, 2012, allegedly because he wanted

27   outdoor time; and on several occasions in April and May of 2013, petitioner refused to meet with

28   clinicians because they would not refer him to an IDTT for EOP status.

1    Moreover, while a GAF score is not dispositive, the predominant GAF score of 65 is not

2    consistent with a finding that petitioner was so impaired by his depression that he could not

3    understand the need to seek habeas relief or take steps to seek such relief.  Petitioner's TABE was

4    consistently listed as 6.6, and special education was noted, but he presented with average

5    intellectual functioning.

6    Importantly, petitioner was able to file an administrative grievance on July 15, 2013,

7    either by himself or with assistance.  See Roberts, 627 F.3d at 773 (mental incompetence did not

8    cause untimeliness where petitioner filed several petitions in state court during time for which he

9    sought equitable tolling).  Petitioner challenged an RVR issued for his alleged refusal to accept a

10   cellmate on the grounds that he did not receive 30 days' notice, and did not receive a copy of the

11   final CDC-115 until two months later, resulting in his late appeal.  The grievance was neatly

12   printed, and appended appropriate documents.  (ECF No. 31-17 at 99, 101.)  Petitioner argues that

13   he was only able to file grievances with the assistance of staff or mental health staff, who cannot

14   assist inmates in filing legal actions or motions.  But petitioner fails to explain why he could not

15   obtain assistance to timely file his habeas petition, particularly where he was able to later file

16   three state habeas petitions, as well as the instant petition.

17   The Ninth Circuit has held that "[w]here a habeas petitioner's mental incompetence in fact

18   caused him to fail to meet the AEDPA filing deadline, his delay was caused by an extraordinary

19   circumstance beyond [his] control, and the deadline should be equitably tolled."  Laws, 351 F.3d

20   at 923 (internal quotation marks omitted, alteration in original).  See, e.g., Forbess v. Franke, 749

21   F.3d 837 (9th Cir. 2014) (reversing district-court decision which had dismissed habeas petition as

22   untimely, panel held that petitioner had showed that his mental illness was so severe that he was

23   unable to understand the need timely to file the petition and made it impossible, under all the

24   circumstances, to meet the filing deadline despite his diligence).  However, in Forbess, the court

25   found that Forbess' delusions persisted throughout the relevant period, and various doctors opined

26   that the prisoner suffered from severe delusions and documented Forbess' belief that he was

27   working for the FBI.  Id.  Here, petitioner did not suffer hallucinations throughout the limitations

28   period; rather, he complained of auditory hallucinations on February 6, 2013, but mental health

1   staff found he suffered from no hallucinations for the rest of the limitations period.  Moreover,

2   earlier, on January 11, 2013, psychiatrist Dr. Davidson opined that petitioner's "voices" were not

3   hallucinations.  (ECF No. 31-11 at 70-71.)

4        In addition, the record reflects that despite being medicated, petitioner was able to

5   communicate with mental health staff; he identified when he believed a certain drug was not

6   working, and could identify drugs that had helped in the past.  In his supplemental filing, after

7   listing all of the various medications petitioner has been prescribed, petitioner argues that "taking

8   most of these medications simultaneously increased the side effects on the petitioner's ability to

9   function at the level that can be said of common people functioning in their ability to function in

10  their daily activities without the need of assistance."  (ECF No. 36-1 at 4.)  However, during the

11  limitations period, once he stopped taking Abilify, it appears that petitioner took Remeron and

12  Mirtazapine from June 2013 through February 2014.  Petitioner did not address the side effects, if

13  any, of Mirtazapine.  The other drugs addressed by petitioner were prescribed either before or

14  after the limitations period.  Aside from his description of the common side effects of Remeron,

15  petitioner fails to articulate how the side effects from Remeron and Mirtazapine kept him from

16  timely filing the instant petition, particularly where the medical records do not reflect that he

17  required assistance with activities of daily living, his cognition was intact, and his thoughts linear,

18  and he was able to request certain treatment or changes in his medication.  Such records

19  demonstrate that petitioner's mental impairments were not so severe that they made it impossible

20  for petitioner to timely file his federal habeas petition, either on his own or with assistance.

21        Viewing the mental health records in their entirety, the record amply demonstrates that

22  petitioner grappled with significant mental health issues during his incarceration, and has been

23  prescribed psychiatric medications, which were adjusted multiple times.  There is evidence that

24  petitioner suffers from various mental impairments such as MDD, depressive disorder, or ASPD.

25  The record also reflects that petitioner had attempted suicide while in the community, and

26  expressed suicidal ideation in January of 2013 when his girlfriend broke up with him, and was on

27  suicide watch from July 24, 2015, to August 7, 2015, and was placed in a MHCB on both

28  occasions.  At such times, petitioner's mental state deteriorated; in January of 2013, his GAF was

1    recorded as 45; in July and August of 2015, his GAF fluctuated from 28 to 40.  However, such

2    events were not a constant or even frequent occurrence.

3          Moreover, the records demonstrate that mental health professionals usually described

4    petitioner's thoughts as organized and linear, his cognition intact, and he had average intelligence.

5    In June and September of 2014, petitioner expressed an interest in pursuing his GED.  Petitioner

6    was able to communicate clearly with medical staff, and articulate when he believed he needed a

7    change in medication or treatment, and he was usually stable on medications, even after he was

8    placed on EOP status.  In addition, some of the records suggest petitioner may have been

9    exaggerating his symptoms, and during his MHCB crisis in July of 2015, records warned prison

10   personnel to "consider the presence of secondary gain given his current Ad-Seg term and multiple

11   pending 115s."  (ECF Nos. 31-12 at 79; 31-13 at 21; 37.)

12         For all of the above reasons, the mental health records demonstrate that petitioner's

13   mental impairments were not so severe that they made it impossible for petitioner to timely file

14   his federal habeas petition, either on his own or with assistance.

15                              b. Diligence

16         In any event, even if petitioner's mental illness was so severe as to meet the first prong of

17   Bills, petitioner failed to support his claim of diligence.  Petitioner "must diligently seek

18   assistance and exploit whatever assistance is reasonably available."  Bills, 628 F.3d at 1100.  A

19   petitioner may satisfy the diligence prong if "the petitioner's mental impairment prevented him

20   from locating assistance or communicating with or sufficiently supervising any assistance

21   actually found."  Id.  "[E]ven in cases of debilitating impairment the petitioner must still

22   demonstrate diligence."  Yeh, 751 F.3d at 1078.  But, as the Supreme Court noted in Holland, the

23   diligence requirement is not maximum diligence but rather reasonable diligence.  560 U.S. at 653.

24   Thus, the court must examine whether, given petitioner's impairments, he was sufficiently

25   diligent.

26         Here, petitioner does not set forth what efforts he undertook, if any, to obtain assistance to

27   file a timely petition, or demonstrate that his mental impairments prevented him from locating or

28   communicating with others for assistance.  Rather, petitioner claims generally that the law library

                                        44

1   did not provide adequate inmate clerks who knew what they were doing and thus he was "at the

2   mercy of finding some inmate legal assistant willing to help him, as general population looks

3   down at inmates that are participants in the mental health system." (ECF No. 36-1 at 2.)  Such

4   allegations are insufficient to show that petitioner was reasonably diligent under the

5   circumstances.  Again, petitioner fails to detail any specific attempts to either prepare his own

6   petition, or to obtain assistance.  Moreover, even considering petitioner's allegations, the court

7   finds them too general and broad to demonstrate that he acted with reasonable diligence to qualify

8   for equitable tolling.  See Whalem/Hunt v. Early, 233 F.3d 1146, 1148 (9th Cir. 2000) (per

9   curiam) (equitable tolling determinations are "highly fact-dependent"); Lott v. Mueller, 304 F.3d

10  918, 923 (9th Cir. 2002) (observing that equitable tolling determinations "turn[ ] on an

11  examination of detailed facts").  Given the absence of detailed facts, petitioner has not carried his

12  burden of showing that he satisfies the diligence prong of his equitable tolling claim.  See

13  Miranda v. Castro, 292 F.3d 1063, 1065 (9th Cir. 2002) ("[Petitioner] bears the burden of

14  showing that [equitable tolling] should apply to him.").

15      Moreover, the records reflect that petitioner filed three state habeas petitions in three

16  different courts, raising substantive legal challenges.  The second state habeas petition has

17  attachments that suggest petitioner may have been assisted by another inmate.  (LD 6.)  The fact

18  that petitioner may have been assisted by another inmate during this period does not change the

19  analysis.  Petitioner apparently knew how to ask for help, as his state habeas petitions were filed

20  and progressed through the courts.  See Roberts, 627 F.3d at 773 (mental incompetence did not

21  cause untimeliness where petitioner filed several petitions in state court during time for which he

22  sought equitable tolling).

23      Importantly, petitioner has not explained why his mental illness, or the effects of

24  medication used to treat that illness, did not prevent him from filing his state and federal habeas

25  petitions when he did, yet allegedly did prevent him from getting help to file the petition during

26  the limitation period discussed above.  See Duran v. Parmo, 2012 WL 5457423, *9 (C.D. Cal.

27  Nov. 7, 2012) (the prisoner failed to show that his alleged mental impairment made it impossible

28  to meet the filing deadline under the totality of the circumstances, including reasonably available

45

1    access to assistance, where evidence reflected prisoner was able to obtain inmate assistance, yet

2    provided no explanation why he could not have filed a timely federal petition with such

3    assistance.) (internal quotes and citations omitted).  "The Court will not stereotype all petitioners

4    diagnosed with a mental illness . . . -- especially those who are treated with medication -- as

5    inherently and endlessly incompetent."  Corral v. Evans, 2010 WL 1267778, *3 (N.D. Cal. Mar.

6    31, 2010).  Here, during the time he filed his state and federal habeas petitions in 2014 and 2015,

7    petitioner was also diagnosed with depressive disorder or MDD, and was prescribed Strattera,

8    Remeron, and Mirtazapine, two of the drugs he was taking during the limitations period.

9    Petitioner fails to demonstrate what obstructed him from filing his state petitions earlier, and from

10   timely filing the instant petition.  In other words, petitioner fails to show his mental impairment

11   was significantly distinguishable during the period the limitations ran from when he actually filed

12   his state and federal habeas petitions.  "Without any allegation or evidence of how petitioner's

13   symptoms actually caused him not to be able to file despite his diligence, the court cannot find

14   that he is entitled to equitable tolling."  Taylor v. Knowles, 2009 WL 688615, at *6 (E.D. Cal.

15   March 13, 2009), aff'd, 368 Fed. Appx. 796 (9th Cir. 2010) (no equitable tolling where petitioner

16   failed to show his auditory hallucinations, severe depression, and anxiety "actually caused him

17   not to be able to file despite his diligence"); see Howell v. Roe, 2003 WL 403353, *4 (N.D. Cal.

18   Feb. 20, 2003) (rejecting equitable tolling where petitioner's suicidal nature and depression did

19   not make him mentally incompetent).

20       Therefore, the court concludes that petitioner has not met his burden to demonstrate that

21   extraordinary circumstances beyond his control -- that either he was unable rationally or factually

22   to personally understand the need to timely file, or his mental state rendered him unable to

23   personally prepare a habeas petition and effectuate its filing -- and that he diligently pursued the

24   claims to the extent that he could understand them, but that the mental impairment made it

25   impossible to meet the filing deadline under the totality of the circumstances.

26       Because the record is sufficiently developed for the undersigned to conclude that

27   petitioner's mental illness was not so severe as to cause the untimely habeas petition, petitioner is

28   not entitled to an evidentiary hearing.  Accordingly, for the reasons discussed above, the

1 | undersigned finds that petitioner is not entitled to equitable tolling based on mental illness.

2 |        B.  Other Claims for Equitable Tolling

3 |        Petitioner's claim for equitable tolling on the basis that mentally impaired inmates should

4 | be provided legal assistance or equitable tolling under the ADA is without merit.  Petitioners have

5 | no right to legal assistance on collateral review.  Coleman v. Thompson, 501 U.S. 722, 752

6 | (1991).  There is no Sixth Amendment right to counsel during state habeas proceedings.  Jeffers

7 | v. Lewis, 68 F.3d 299, 300 (9th Cir. 1995).  The state is not required to provide assistance to

8 | "enable the prisoner to discover grievances, and to litigate effectively once in court."  Lewis v.

9 | Casey, 518 U.S. 343, 354 (1996).

10 |        In addition, petitioner's claim that he should be provided legal assistance under the ADA

11 | is not cognizable in a federal habeas action.  A habeas corpus petition is the correct method for a

12 | prisoner to challenge the "legality or duration" of his confinement, Badea v. Cox, 931 F.2d 573,

13 | 574 (9th Cir. 1991), quoting Preiser v. Rodriguez, 411 U.S. 475, 485 (1973).  However, a civil

14 | rights action pursuant to 42 U.S.C. § 1983 is the proper method for a prisoner to challenge the

15 | conditions of that confinement.  McCarthy v. Bronson, 500 U.S. 136, 141-42 (1991); Preiser, 411

16 | U.S. at 499; Badea, 931 F.2d at 574.  The issue of equitable tolling on the basis of mental

17 | impairment is governed by Bills, as addressed above.

18 |        Petitioner concedes he has zero understanding of the law.  (ECF No. 23 at 12.)  However,

19 | to the extent that petitioner contends that the extraordinary circumstance was his lack of

20 | understanding of the law, his claim for equitable tolling must fail.  Rasberry v. Garcia, 448 F.3d

21 | 1150, 1154 (9th Cir. 2006) (pro se petitioner's ignorance and confusion about the law not

22 | sufficient); see, e.g., Hughes v. Idaho State Bd. of Corr., 800 F.2d 905, 909 (9th Cir. 1986) (pro se

23 | prisoner's illiteracy and lack of knowledge of law unfortunate but insufficient to establish cause).

24 | In addition, to the extent petitioner contends that the condition of being housed in ad seg,

25 | although it does result in increased limitations on access to legal materials and the law library, is

26 | not an extraordinary circumstance entitling him to equitable tolling.  Ramirez v. Yates, 571 F.3d

27 | 993, 998 (9th Cir. 2009) (equitable tolling not warranted where petitioner housed in ASU despite

28 | increased limitations on access to law library and legal materials).

1  VI.  Alternative Grounds

2      Petitioner challenges his conviction on the grounds that he suffered ineffective assistance

3  of counsel in both his current and prior criminal cases in connection with his guilty plea and

4  sentencing.  (ECF No. 1 at 9.)  Petitioner states that between October 21, 1990, and October 29,

5  1990, he was charged with nine counts of robbery in two separate cases in Alameda County

6  Superior Court.  (ECF No. 1 at 10.)  Petitioner was represented by counsel and on August 9,

7  1991, petitioner accepted a plea deal in which he agreed to plead guilty to all nine counts of

8  robbery in exchange for a 25 year sentence.  (Id.)  Petitioner then recounts a series of 19

9  robberies,[11] some of which were multiple robberies occurring on one day, that he was charged

10  with committing over the eight day period in October of 1990.  (ECF No. 1 at 11.)  Petitioner

11  contends that because these crimes took place in close proximity and in the same court

12  jurisdiction, and all involved the same criminal intent, i.e., robbery, they should have been

13  charged in one criminal case.  (ECF No. 1 at 12, 14-15.)  Petitioner argues that he received no

14  benefit from the plea bargain because he was subjected to a second prior conviction under

15  California Penal Code § 667(a), thereby facing a twenty-five year to life sentence under

16  California's Three Strikes Law, and resulting in his attorney negotiating a plea bargain for a

17  determinate sentence of 30 years in the 2011 conviction.

18      Respondent argues that to the extent petitioner challenges the validity of prior convictions

19  used to elevate petitioner's current sentence, such claims are foreclosed by Lackawanna County

20  Dist. Atty. v. Coss, 532 U.S. 394, 402 (2001).  (ECF No. 13 at 4-5.)  Respondent contends that

21  because petitioner's predicate prior is "no longer open to direct or collateral attack in its own right

22  because [petitioner] failed to pursue those remedies while they were available (or because

23  [petitioner] did to unsuccessfully)," petitioner "may not challenge the enhanced sentence through

24  a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained."

25  (ECF No. 13 at 5, quoting Lackawanna, 532 U.S. at 402.)

26      As a general rule, if a prior conviction used to enhance a state sentence is fully expired in

27  ───────────

28  [11]  The 19 robberies are also described in detail in the attachment to petitioner's habeas petition filed in the superior court.  (LD 4, Ex. 2 at 2-5.)

48

1    its own right, the defendant may not collaterally attack his prior conviction through a  § 2254

2    petition.  Daniels v. United States, 532 U.S. 374, 383 (2001); Lackawanna, 532 U.S. at 403-04;

3    Gill v. Ayers, 342 F.3d 911, 919 n.7 (9th Cir. 2003).  In this regard, the Supreme Court has held

4    that "once a state conviction is no longer open to direct or collateral attack in its own right

5    because the defendant failed to pursue those remedies while they were available (or because the

6    defendant did so unsuccessfully), the conviction may be regarded as conclusively valid."

7    Lackawanna, 532 U.S. at 403.  The Supreme Court has recognized the following exception to this

8    general rule:  a defendant may challenge an expired conviction in the context of an enhanced

9    sentence "on the basis that the prior conviction used to enhance the sentence was obtained where

10   there was a failure to appoint counsel in violation of the Sixth Amendment, as set forth in Gideon

11   v. Wainright."  Lackawanna, 532 U.S. at 404 (citing Gideon v. Wainright, 372 U.S. 335

12   (1963)).  See also Daniels, 532 U.S. at 382 ("this rule is subject to only one exception"); Franklin

13   v. Small, 161 F.Supp. 2d 1087, 1102 n.3 (N.D. Cal. 2001).[12]

14          In Daniels, the United States Supreme Court also suggested that another exception to this

15   rule may be available in "rare cases in which no channel of review was actually available to a

16   defendant with respect to a prior conviction, due to no fault of his own."  532 U.S. at 383.  The

17   Court in Daniels did not elaborate on the type of "rare" case it was referring to.  However, in

18   Lackawanna the Supreme Court provided as an example a case in which a state court, without

19   justification, refused to rule on a constitutional claim that was properly presented to it, or a case in

20   which, after the time for direct or collateral review had expired, the defendant obtained

21   compelling evidence of actual innocence which he could not have uncovered in a timely manner.

22   532 U.S. at 405.  In such circumstances an exception to the general rule barring collateral attack

23   on an expired sentence may be warranted because a federal habeas petition directed at a sentence

24   enhanced by such an expired sentence "may effectively be the first and only forum available for

25   _____

26   [12]  The Supreme Court observed that Gideon claims have a special status because "the 'failure to
     appoint counsel for an indigent [is] a unique constitutional defect . . . ris[ing] to the level of a

27   jurisdictional defect,' which therefore warrants special treatment among alleged constitutional
     violations."  Lackawanna, 532 U.S. at 404 (quoting Custis v. United States, 511 U.S. 485, 496

28   (1994)).

review of the prior conviction."  Id. at 406.  The court in Lackawanna explained the rationale for

allowing a collateral challenge to a prior conviction under such rare circumstances as follows:

> The general rule we have adopted here and in Daniels reflects the notion that a defendant properly bears the consequences of either forgoing otherwise available review of a conviction or failing to successfully demonstrate constitutional error.  It is not always the case, however, that a defendant can be faulted for failing to obtain timely review of a constitutional claim.

Lackawanna, 532 U.S. at 405.

Here, petitioner's 1991 Alameda County convictions are no longer open to direct or

collateral attack.  (LD 4, Ex. 1-2.)  The undersigned queried the CM/ECF electronic filing system

for the United States District Court for the Northern District of California, which reflects no

petition for writ of habeas corpus challenging the 1991 conviction by petitioner.  It is undisputed

that petitioner was represented by counsel; thus, petitioner's claim does not fall under the narrow

exception to this rule and is not subject to review.  Assuming, without deciding, that there is an

exception to the rule set forth in Lackawanna and Daniels for "rare cases," the undersigned

concludes that the circumstances of this case do not justify the application of such an exception.

See Johnson v. United States, 544 U.S. 295, 304 n.4 (2005) (stating that the Court has recognized

"only one exception" to the prohibition on federal collateral attacks on prior state convictions and

declining to explore the possible "rare" second exception).[13]

Accordingly, respondent's motion to dismiss petitioner's claims challenging the validity

of his prior criminal convictions used to enhance his current sentence be granted.

////

////

_____

[13]  In denying the petition for writ of habeas corpus on this claim, the Sacramento County Superior Court applied  the two-prong test required in Strickland v. Washington , 466 U.S. 668 (1984), and found that because the offenses committed by petitioner were committed at different times, at different places, and against different victims, constituting separate and distinct offenses, any argument that such offenses should be charged as a single count "would be denied as meritless."  (LD 5 at 4.)  Moreover, the superior court noted that petitioner's belief that charging all of the offenses in one criminal case would require prosecutors in future cases to only apply one strike was unavailing because it is the existence of a prior conviction for a qualifying offense that constitutes a strike prior.  (LD 5 at 4.)

VII.  Conclusion

Accordingly, IT IS HEREBY ORDERED that the May 10, 2016 findings and recommendations (ECF No. 22) are vacated; and

IT IS RECOMMENDED that:

1.  Respondent's motion to dismiss (ECF No. 13) be granted; and

2.  This action be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 9, 2017

/bloc1416.mtd.hc.sol.amd

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE